GERTRUDE E. JAMESON *vs.* G. GILMORE WELD.

Penobscot.    Opinion December 14, 1899.

*Verdict.   New Trial.   Malpractice.   Evidence.   Exceptions.*
*R. S., c. 82, § 83.*

Under a motion for a new trial on the ground that the verdict was against evidence, the verdict will not be set aside, unless it is, upon all the evidence, clearly wrong. It is not enough that it may be wrong, or that the court might have come to a different conclusion. *Held*; in this case, that the evidence for the plaintiff does not seem inherently improbable, and, if believed, is sufficient to sustain the verdict.

In a case of malpractice to an arm where it is claimed that the present condition of the arm is due to the want of care or skill on the part of the defendant, it is within the discretion of the presiding justice to permit the arm to be exhibited to the jury, although the defendant may claim that the present condition of the arm is due to some other cause.

It is within the discretion of a presiding justice to admit in evidence an X-ray photograph. Whether it is sufficiently verified, whether it appears to be fairly representative of the object portrayed, and whether it may be useful to the jury, are preliminary questions addressed to him, and his determination thereon is not open to exceptions.

A presiding justice in his charge may call the attention of the jury to the differing contentions of the parties, and the evidence by which they seek to support them; and if in so doing, he misrecites the evidence, his attention must be called to the specific error before the jury retires, in order that it may be corrected at once, and an accidental mistrial prevented. And this is so, even if the presiding justice may not require exceptions to be specifically noted before the jury retires.

The use of the word "pungent," by the presiding justice, in alluding during his charge to the jury to iodine or ointment used upon the plaintiff's arm, though it may be inaccurate, is not deemed to be prejudicial.

*Held;* that in the remaining instructions to which exceptions are taken, the presiding justice did not invade the province of the jury, or exceed the legitimate province of the court.

ON MOTION AND EXCEPTIONS BY DEFENDANT.

This was an action on the case against the defendant, a physician and surgeon, for malpractice in treating the plaintiff for an injury to the elbow of the right arm. The plea was the general issue. The verdict was for the plaintiff for $500.00. Besides a

general motion for a new trial, exception is taken by the defendant to the following extracts from the charge of the presiding justice:

1.   The presiding justice, after having called the attention of the jury to the injury and the treatment by the defendant in reducing the dislocation and fracture, if there was one, then said: "The next morning, if I remember correctly, he called the family physician, took off the bandages, or loosened the bandages and, perhaps, loosened the splints—I don't remember particularly about that, but, at any rate, he so far exposed the arm that the doctor who came in saw it, and you have heard what he said in regard to it.   Then the splints and bandages were replaced and the arm remained in that condition.   That continued for a period of some two weeks, I think.   I may be in error about the time; it is no matter, but for some little period of time, when he says that he undid the bandages and then began to flex the joint."

2.   The presiding justice after remarking in substance, that at the end of the fourth week, the defendant discovered that the bones were again out of place, that they had been pushed by the end of the humerus, said:—

"Now, was he at fault in not discovering earlier whether they had been pushed by?   That would depend very much when they were again dislocated.   He did not discover it until the end of the fourth week.   During that time he was flexing the joint, and he testifies that he came there every day.   Is there any evidence to satisfy you, by a preponderance, that he was negligent in not securing the parts, supporting the parts, with his fingers or otherwise, so as not to have that result happen?   Then, again, according to his statement, at the end of the fourth week he was met with the fact that the joint had again been dislocated.   He says that he then at first, for a day or two, considered it, and then administered ether and attempted to replace the bones of the joint, and he contends that this small bone here, which I shall call the crown, must have broken so as to permit, when the joint was flexed, of its slipping by, and that that was one of the reasons why the joint would not remain where he had placed it."   .   .   .

"These are considerations wholly for you in determining what happened, in the light of all the testimony of the case."

3. The presiding justice further charged the jury as follows: "Then, at the end of the fourth week, having discovered that the bones were again out of place, and having taken time to consider, the doctor tells you that he attempted, by administering ether, to reduce the dislocation, but was unable to do it, and that then he continued rubbing, pulling, massage treatment, using lubricating or pungent liniments upon the parts, hoping thereby to bring it back into place, or so nearly so as to be equivalent to that."

The defendant's exception to this clause is to the use of the word "pungent," which was noted before the jury retired.

4. The presiding justice, in calling the attention of the jury to the surrendering of the case by the defendant to Dr. Rowe, at the end of the eleventh week, said:—

"But, gentlemen, you must bear in mind that when Dr. Weld left the patient and substituted Dr. Rowe, Dr. Rowe could not justify himself by following and acting simply upon the skill and knowledge which Dr. Weld had, because, he, again, was required to exercise his best skill and judgment and to act with absolute fidelity, and if he considered it was his duty, under all the circumstances, in order to benefit his patient, to give her the benefit of hospital treatment, it is hard for me to say his conduct can be censured for doing so. But it is said by the defendant that his motive was to involve Dr. Weld in the charge of malpractice, that he did this maliciously. Well, gentlemen, no matter what his motive was, no matter if it was malicious; if he acted prudently and wisely, as his judgment told him it was best for him to act, and best for his patient, he was justified in doing it; and whether he did it for one purpose or another, only bears upon the question as to how far he is a partisan, and how far he is prejudiced and how far he would be led to misstate, to distort or to color the facts of the case. You saw him and you heard him testify; and he frankly, so far as I saw, told you what he did. There is much controversy about his motives. So far as anything that has been said would give you

reason to discredit the truth of what he has said, that, gentlemen, is competent and proper for you to take into consideration."

5. The presiding justice, in commenting upon the testimony of the experts, said:—

"So, gentlemen, so far as their opinions go, you will take them and consider them for what they are worth. But, above all, in this case, take the testimony of the witnesses who were actors in it; take the testimony of the plaintiff, as she has described her condition, her treatment, her feelings, her talk. Take the testimony of the doctor, as he has told you what he did, how he acted, how he felt and what he hoped; and if, on the whole, the plaintiff has satisfied you by a preponderance of evidence, she is suffering an injury from the doctor's want of the requisite skill, that is, want of ordinary skill to treat her case, which the law required him to have, or from the want of proper care, and for negligence after he undertook her treatment, or for the want of good faith in not giving her sufficient knowledge to give her an opportunity to change the treatment if she desired, then, gentlemen, for any of those things which she satisfies you, by a preponderance of the evidence, she is entitled to recover compensation; that is, an equivalent for the injury suffered at the hands of the defendant."

The defendant also took exceptions to the admission of evidence as follows:—

Gertrude E. Jameson, the plaintiff, on direct examination, testified, in part, as follows:

"Q. Now, after you got to the hospital, what took place there? (Objected to. Admitted. Defendant excepts.)

A. The arm was examined by the doctors and then through the X-ray instrument by the doctors.

Q. Did the physicians present examine your arm through the X-ray instrument prior to treating it or giving you ether?

A. Yes.

Q [By the Court]—Go on and tell what was done.

A. They examined the arm, and then examined it through the X-ray instrument, and they consulted. . . . .

Q. Can you take your sleeve up so that the jury can see your arm, please?

(Objected to upon the ground that the arm is not now in the position it was when the defendant left it. Objection overruled. Arm permitted to be exhibited. Defendant excepts. Arm exhibited to the jury.)"

Dr. W. L. Hunt, called for the plaintiff, on direct examination, testified, in part, as follows:

"Q. I ask you if, looking through the fleuroscope, you saw those bones the same as they are represented on that photograph (Exhibit No. 1)?

A. Yes, sir.

(Said photograph Exhibit No. 1 offered in evidence. Objected to.)

Q. Was the instrument properly adjusted to take that photograph of her arm? (Objected to.)

Q. How did you and the artist arrange the instrument?

The Court. So as to produce what effect? I suggest it; I don't put it in.

A. So as to take the arm from above downwards. The plates were put under the arm, in this way (illustrating). The X-ray was placed above the arm. The rays went up and down, with the arm at the level of the shoulder, practically.

Q. What was the result produced?

A. We got a picture of the shadow of the entire portion of the bones.

Q. Whether or not that was a natural picture of them?

A. It was.

Q. And is that photograph a natural picture of them?

A. It is.

(Said photograph, Exhibit No. 1 offered in evidence by counsel for plaintiff. Admitted. Defendant excepts.)" . . . .

"Q. Does that (Exhibit No. 1) show any fracture, Doctor, whatever? (Objected to. Admitted. Defendant excepts.)

A. No. . . . ."

Dr. Arthur W. Rowe, called for the plaintiff, on direct examination, testified in part, as follows:

Q. " You may state to the jury what diagnosis you made, and what you found.

A. Well, I found, to my satisfaction, a backward dislocation of both bones of the joint, the radius and ulna. The means that I used were measuring from the olecranon process, the one here (indicating) which always has the same relation with the elbow in all positions of the arm, or nearly so, no matter how high or how low the shoulder is, and I found, measuring down the condyles on either side that the distance was exactly the same, or practically the same as it was on the well arm, when they were placed in the same position. Then I measured from the same place to the point of the olecranon process, the tip of the elbow, and I found that about an inch and a quarter shorter than it was on the other side, the other arm. Then I noted the relations of the point of the elbow with the two condyles, the internal and the external condyle, and I found that, instead of being on a line with the tip of the olecranon it come by the head of the olecranon process with a line drawn to the other. I further noted that the relation of the two condyles were the same as they were in the other arm; but there was no separation of the condyles and that they were in the same relation so far as measuring from the olecranon down. They were not lifted up or drawn down. The line was somewhat diagonal, the same as the other, the line drawn across from one condyle to the other, and they were, and the condyles were, at that time the same as in the other arm exactly. She stated to me — (objected to.)

The Court. If he is describing her injury, her condition, her injury, which she gave him. [Defendant excepts.]

Witness. Yes. I had to depend somewhat on what she said. She said that it was claimed that the condyles were both broken somewhere. I couldn't tell whether she meant transverse across the base of the condyles, or whether broken through into the joint, but she said they were both broken, that is, it was claimed they were, and that the olecranon process was broken off, gone, and the

radius was broken. My diagnosis was influenced somewhat by what she said, so I said at the time that I wouldn't be positive there had been any fracture there at all, but it was evident there was a downward dislocation of both bones which had never been reduced; but I couldn't find any evidence that there had been any fracture of any bone. So that, while admitting that it is possible there had been, I felt in my own mind that the union must have been perfect, and that the parts were in the same position they were before they were fractured, a thing that was very unusual; so that I was very well satisfied, enough to act upon it at any time, that it was simply a dislocation of both bones backward."

The entire charge of the presiding justice and a full report of the evidence were made a part of the exceptions.

At the close of the charge, the presiding justice inquired of the counsel for both parties if they desired any further instructions to the jury. Counsel for the defendant requested one instruction, which was given, and he then said he had no others. No suggestion was made of any inaccurate statement in the charge of the presiding justice, nor was any request made for the correction of any or any exception therefor noted before the jury retired except as to the use of the word "pungent" as before stated.

*P. H. Gillin, C. A. Bailey and T. B. Towle,* for plaintiff.

*L. T. Carleton and J. F. Gould,* for defendant.

SITTING: EMERY, WISWELL, STROUT, SAVAGE, FOGLER, JJ.

SAVAGE, J. This is an action on the case for damages alleged to have been occasioned by the surgical malpractice of the defendant, who is a physician and surgeon. The defendant was called to attend the plaintiff a short time after she received injuries to her right elbow joint, and it appears that he diagnosed them as a fracture and a dislocation. That there was a dislocation of both the ulna and the radius is not questioned. That there also was a fracture of some bone or bones in the elbow joint is in dispute. The defendant insists that the evidence tends strongly to show the affirmative of that proposition. This controversy, however, relates

to the dislocation. The plaintiff in her declaration makes no complaint of malpractice in the defendant's treatment of any fracture. She alleges, rather, a want of proper skill and care on the part of the defendant in reducing the dislocation, which he undertook to do. It is, indeed, the present contention of the plaintiff that there were no fractures, that the defendant's diagnosis was wrong, and that his treatment accordingly was wrong. But if the plaintiff is in error in this respect, it still remains necessary to inquire whether, there being fractures, the dislocation was treated with that reasonable degree of skill and care which the law imposes upon surgeons. The fractures, if any there were, are only important as bearing upon the condition of the elbow joint while being treated by the defendant, and as tending to show, with other things, that the defendant did or did not use reasonable skill and care under all the circumstances.

The defendant says that he reduced the dislocation of the ulna at the time he first treated plaintiff, but did not succeed in reducing the dislocation of the radius. He says that he attempted afterwards, from time to time, to secure a reduction of the latter dislocation, by manipulations and otherwise, but never succeeded. He also says that he discovered about a month after his first treatment that the ulna had come out of place again, in some way, and that he then attempted by all proper and reasonable means to replace it. This he was never able to do. And in this situation, both the radius and the ulna dislocated, the defendant, having occasion to be absent from town, left the plaintiff's arm, after about eleven weeks from the injury. He called another surgeon to take his place, and this was done with the plaintiff's consent. The defendant had nothing further to do with the case.

It would serve no good purpose to enlarge this opinion by any particular analysis of the evidence. No two cases of this sort are alike, and rarely are they so nearly alike that one case is valuable as a precedent for another. There is much evidence of an expert nature that the treatment given by the defendant was the usual and proper treatment. This, of course, was largely based upon the testimony of the defendant as to what he found and what

he did.    There is also medical testimony, on the other hand, that it
was improper in some respects.    The parties themselves, the plain-
tiff and the defendant, differ in their testimony, not so much in
regard to the real condition of the elbow, for of that the plaintiff
does not claim to know anything, nor in regard to the actual
treatment, but with respect to the statements made by him to her
from time to time, concerning the condition of the elbow and his
knowledge of it.    The defendant claims that he acted in good
faith with the plaintiff, and that he fully and correctly explained
to her the condition of the elbow, and the want of success he had
experienced in trying to reduce the dislocation.    On the other
hand, the plaintiff claims that the defendant never told her of his
failure in that respect, that he did not state to her the true condi-
tion of her arm, and the liability she was under of being seriously
and permanently crippled in her arm, that he did not, in substance,
fully apprise her of her situation, so that she might obtain other
surgical treatment; but she says that, being inquired of by her in
the ninth week of the treatment, he assured her that the disloca-
tion had been reduced successfully the first time he treated her.
Her statement, if true, does not of itself prove want of skill or
care on the part of the defendant, but it does show a purpose to
conceal from her the true condition, for some reason or other.    It
tends to show that the defendant himself was conscious, not only
of failure, but of a failure for which he was responsible.    And if
her statement was believed by the jury, they were entitled to give
it considerable weight, and undoubtedly did so, especially in view
of the conflict of the medical testimony.

    In addition to matters already stated, it appears that the defend-
ant so treated the injury that when the elbow joint became stiff,
the arm was extended nearly straight, and was useless.    The plain-
tiff claims that the defendant improperly placed and left it in this
position.    Her contention is that, if the joint must be stiff, the
proper way would have been to leave the arm flexed, so that it
could be made somewhat useful, and that reasonable care and skill
would have suggested this mode of treatment to the defendant.
And whether the defendant used reasonable skill in this respect
was one of the propositions before the jury.

VOL. XCIII.    23

Upon the whole, we find ourselves unable to say that the verdict of the jury, upon all the evidence, is clearly ·wrong. It is not enough that it may be wrong, or that the court might have come to a different conclusion. We think the evidence for the plaintiff, if believed, is sufficient to sustain a verdict, and that evidence does not seem to be inherently improbable. The defendant's motion for a new trial must therefore be overruled.

In the course of the trial, the plaintiff was permitted, against the objection of the defendant, to exhibit her injured arm to the jury, and to this permission the defendant excepted. We think the exception cannot be sustained. The present condition of the. arm is claimed by the plaintiff to have been the consequence of the defendant's want of skill or care. Such is the effect of her evidence. This is denied by the defendant. Whether it was so or not, or whether some cause for which the defendant is not responsible had intervened and made the arm worse than it otherwise would have been, were questions of fact to be submitted to the jury. In view of the plaintiff's contention and evidence, we think it was clearly within the discretion of the court to permit the arm to be shown to the jury.

Within a week after the defendant had ceased attending her, the plaintiff was taken to a hospital for further treatment, and there, before anything was done to the arm, an X-ray photograph of the elbow was taken. This X-ray photograph was admitted in evidence, against the objection of the defendant, and exceptions were noted. The learned counsel for the defendant say that their objection lies not to the admissibility of X-ray photographs in general, but to the admissibility of this one in particular, which they claim is an exaggeration and a distortion. We think it is within the discretion of the presiding justice to admit an X-ray photograph. Whether it is sufficiently verified, whether it appears to be fairly representative of the object portrayed, and whether it may be useful to the jury, are preliminary questions addressed to him, and his determination thereon is not open to exceptions. *Carey* v. *Hubbardston,* 172 Mass. 106. We may add that an examination of the testimony and of the photograph does not show that this discretion was unwisely exercised in this case.

The defendant also has exceptions to certain portions of the charge of the presiding justice. He claims, in the first place, that certain testimony was inaccurately quoted to the jury. It appears by the report, however, that during the charge and before the case was committed to the jury, (with a single exception, to be noted later), no suggestion was made by counsel of any inaccurate statement in the charge, nor was any request made for a correction of any statement. An inadvertent misstatement of facts is not an "expression of opinion," forbidden by the statute. *Grows* v. *Maine Central R. R. Co.*, 69 Maine, 412.

It is the duty of a presiding justice to present to the jury the issues to be determined, and, in his discretion, to call attention to the differing contentions of the parties, and the evidence by which they seek to support them. If in doing so, he makes a misstatement of the evidence, his attention must be called to the error before the jury retires. *Harvey* v. *Dodge*, 73 Maine, 316; *Smart* v. *White*, 73 Maine, 332; *Bradstreet* v. *Rich*, 74 Maine, 303; *State* v. *Fenla son*, 78 Maine, 495. And attention must be called to the error specifically in order that it may be corrected. The rule is not for the convenience of presiding justices, but to prevent unnecessary and accidental mistrials. A mistake, like the misrecital of evidence, can be, and should be, corrected at once. It is not good legal policy, nor is it justice to parties litigant, to permit one to sit by and hazard the chance of a verdict, all the time reserving an easily correctible error, to be the basis of exceptions, in case of an untoward result with the jury. And for this reason, even if the presiding justice may not require exceptions to be specifically noted before the jury retires, as may have been the case in this instance, it is no less the duty of parties to call attention to errors of this kind before the case is committed to the jury. If counsel fail to ask for the correction of such errors at the time, it is to be presumed that they deemed them too trivial and unimportant for notice. The rule is not unreasonable nor unfamiliar. In fact, in this case, counsel did call seasonable attention to such an alleged error. There was evidence that the defendant in the course of his treatment of the elbow, used iodine or ointment upon it to allay

the inflammation.    In alluding to this evidence, the presiding jus-
tice made use of the expression "lubricating or pungent liniments,"
and to the use of the word "pungent" the defendant objected, and
called attention to it before the jury retired.    It may be that the
use of the word "pungent" was inaccurate, but we are unable to
see how it could have been prejudicial.

The defendant next urges that a portion of the charge is excep-
tionable, because it is virtually an "expression of opinion" concern-
ing the credibility of a witness, and so a violation of R. S., c. 82,
§ 83.    Dr. Rowe, the surgeon in whose charge the defendant left
the plaintiff, was a witness for the plaintiff.    He testified that the
defendant did not communicate to him the fact that there had ever
been a dislocation, and that he only ascertained that fact by his
own examination.    This was denied by the defendant, who claimed
also that Dr. Rowe, in his professional conduct in this case, and in
his testimony at the trial, was actuated by unfriendly and malicious
motives.    Upon this subject, the presiding justice said:—"Then, at
that period, the defendant leaves the patient and calls another
physician to take charge of her.    The other physician comes, and
he says that he was not told of the dislocation.    On the other
hand, Dr. Weld says that he was, and there are various pieces of
testimony tending to substantiate the story of one or the other.
Dr. Rowe, the physician called, having found the arm in the con-
dition I have described, declined to follow the treatment which Dr.
Weld had been following, and which it was suggested that he
should follow, but he considered it his duty to immediately inform
the patient of the condition of things and to give her an oppor-
tunity to be removed to a medical hospital where she might be
treated.    Much criticism has been made of Dr. Rowe in this
regard, for not following out the treatment which was suggested to
him by Dr. Weld.    But, gentlemen, you must bear in mind that
when Dr. Weld left the patient and substituted Dr. Rowe, Dr.
Rowe could not justify himself by following and acting simply
upon the skill and knowledge which Dr. Weld had, because he,
again, was required to exercise his best skill and judgment and to
act with absolute fidelity, and if he considered it was his duty,

under all the circumstances, in order to benefit his patient, to give her the benefit of hospital treatment, it is hard for me to say his conduct can be censured for doing so. But it is said by the defendant that his motive was to involve Dr. Weld in the charge of malpractice, that he did this maliciously. Well, gentlemen, no matter what his motive was, no matter if it was malicious; if he acted prudently and wisely, as his judgment told him it was best for him to act, and best for his patient, he was justified in doing it; and whether he did it for one purpose or another only bears upon the question as to how far he is a partisan, and how far he is prejudiced and how far he could be led to misstate, to distort, or to color, the facts of the case. You saw him and you heard him testify; and he frankly, so far as I saw, told you what he did. There is much controversy about his motives. So far as anything that has been said would give you reason to discredit the truth of what he has said, that, gentlemen, is competent and proper for you to take into consideration."

The first expression claimed to be objectionable is,—"if he considered it was his duty, under all the circumstances, in order to benefit his patient, to give her the benefit of hospital treatment, it is hard for me to say his conduct can be censured for doing so;" and the second is,—"You saw him, you heard him testify; and he frankly, so far as I saw, told you what he did." The general objection is that the credibility of the witness being in issue, the comments of the justice presiding were calculated to impress the jury as an indorsement of the witness, that to some extent, at least, the court vouched for him. It is beyond question that the credibility of a witness is for the consideration of the jury, and not the court. At the same time it is equally clear that it is the duty of the court to see that the testimony of a witness is fairly presented to the jury. Here was the case of a witness whose credibility was put in question, and to do that, his conduct and his motives were assailed. Such a proceeding, so far as it is logical and reasonable and based upon the evidence in the case, is legitimate. But in the heat of argument it frequently happens that positions are taken, or arguments are used, which are not warranted

by the facts. In such a case, we think it is quite within the province of the court to call the attention of the jury so far to the merits of the particular controversy that they may be able to perceive the true issue, and the legitimate bearing of the arguments which have been addressed to them. It is the duty of a court to see that cases are tried upon true issues, and thus to aid in securing true results. We do not think the justice presiding exceeded the discretion confided to him. *State* v. *Day*, 79 Maine, 120; *York* v. *Maine Central R. R. Co.*, 84 Maine, 117. We can only infer what the criticism was to which allusion is made, but we cannot assume, in the absence of knowledge, that the remarks of the presiding justice were unfounded.

Finally, exception is taken to a comment concerning the value of expert testimony as found in the following excerpt from the charge: "Now, there have been a large number of professional gentlemen called here, who, until they were called here, knew nothing more about this case than you or I. They did not see it, and they have never seen it so far as I know. They are called, not in one sense, to testify to facts within their knowledge, but they are called to testify to scientific facts within their knowledge, and to express opinions. And you must bear in mind that, where their opinions are taken, there is given to them an assumed state of facts, an assumed condition, on which their answers are based; and if the assumed condition be untrue or inaccurate, then, of course, their answers were inaccurate, and neither one of these learned gentlemen would wish the jury to take their answers except as based upon the conditions which were presented to them. Now, they have told you what would be good surgery and what would not be good surgery; and they have asserted that if one man's account was correct it was sufficient, that if another man's account is accurate, perhaps it would not be. So, gentlemen, so far as their opinions go, you will take them and consider them for what they are worth. But above all, in this case take the testimony of the witnesses who were actors in it; take the testimony of the plaintiff, as she has described her condition, her treatment, her feelings, her talk. Take the testimony of the doctor, as he has told you what he did, how

he acted, how he felt and what he hoped, and if, on the whole, the plaintiff has satisfied you by a preponderance of evidence, she is suffering an injury from the doctor's want of the requisite skill, that is, want of ordinary skill, to treat her case, which the law required him to have, or from the want of proper care, and for negligence after he undertook her treatment, or for the want of good faith in not giving her sufficient knowledge to give her an opportunity to change the treatment, if she desired;—then, gentlemen, for any of those things of which she satisfies you, by a preponderance of the evidence, she is entitled to recover compensation;—that is, an equivalent for the injury suffered at the hands of the defendant." Objection is made to the sentence: " So far as their opinions go, you will take them and consider them for what they are worth." But we think that this portion of the charge taken as a whole is unexceptionable. The justice had already pointed out that the opinions were necessarily based on " an assumed state of facts, an assumed condition," and that if the assumed condition was untrue or inaccurate, " then, of course, their answers were inaccurate;" that the experts had told the jury what would be good surgery, and that if one man's account was correct, it (the surgery) was sufficient, and that if another man's account was accurate, perhaps it would not be. This was proper, and was, we think, saying in effect, all that was afterwards put into words, that the opinions must be taken "for what they were worth." They must be considered "for what they were worth" in connection with the accuracy or inaccuracy of the assumed conditions upon which they were based, as the jury might find them. We do not think the jury could have understood the expression to mean more than that.

The other exceptions are not pressed.

*Motion and exceptions overruled.*