# RICHARD WYLDES, an Infant, by J. M. McLaughlin, his Guardian, v. E. G. PATTERSON.

## (153 N. W. 630.)

**Mathematical demonstration — facts proved by — photographs — testimony.**

1. Where a fact may be positively and accurately proved by a simple mathematical demonstration and computation, it is not error to exclude photographs, and other testimony which seeks to controvert the established laws of mathematics.

**Distance — position — mathematically established — certainty — judicial notice — results of such calculations.**

2. The distance back upon the roof of a building where a man standing on such roof comes within the range of vision of a person standing in the street can be mathematically demonstrated to a certainty; and the court may take judicial notice of what the results of the mathematical computation necessary to establish the fact would be.

**Risk — assumption of risk — doctrine of — application of.**

3. The doctrine of the assumption of the risk applies only to risks which the plaintiff knows and appreciates, or which in the exercise of due care he should have known and appreciated.

---

Note.—In addition to the notes in 2 L.R.A.(N.S.) 647, on the master's liability for injury to employee caused by defective elevator and negligence of fellow servant, and in 16 L.R.A. 19, on the relation of proximate cause doctrine to master's liability for injuries to servants from combined negligence of himself and fellow servant, which are cited in the opinion, the following notes will be of value in connection with this case:

Facts of which the court will take judicial notice, notes in 89 Am. Dec. 663, and 124 Am. St. Rep. 20.

Use of photographs in evidence, notes in 35 L.R.A. 802; 15 L.R.A.(N.S.) 1162; 51 L.R.A.(N.S.) 843; 75 Am. St. Rep. 468, and 114 Am. St. Rep. 437.

Liability of owners of elevators for injuries to employees, notes in 41 L.R.A. (N.S.) 156, and 56 Am. St. Rep. 806.

The general doctrine of assumption of risk, notes in 13 L.R.A. 374, and 52 Am. Rep. 737.

Burden of proof as to contributory negligence, notes in 33 L.R.A.(N.S.) 1085, and 28 Am. Rep. 563.

Application of doctrine of *res ipsa loquitur* as between master and servant, notes in 6 L.R.A.(N.S.) 337; 16 L.R.A.(N.S.) 214, and 28 L.R.A.(N.S.) 586, 591.

**Accident — elevators — raising and lowering — engineer — signals — precaution — master — instructions.**

4. Where an accident occurs through the premature lowering of an elevator, upon which the plaintiff is placing a wheelbarrow, and the evidence shows that the engineer who operated the engine which raised and lowered the elevator relied upon a system of signals, which the foreman in control of the plaintiff had, a short time prior to the accident, ordered discontinued, and the plaintiff himself was led to believe that such system was not in operation, and that the engineer would not rely thereon, but would use every precaution to give him ample time to draw back from said elevator, it cannot be said, as a matter of law, that such employee assumed the risk of the confusion of methods of operation which arose from the failure of the master to arrange for a common system, and to make it known to all of the parties concerned.

**Photographs — evidence — offer of — denial — location of premises.**

5. It is not error to refuse to allow photographs to be introduced in evidence, where the premises involved are within three blocks of the courthouse, and an inspection is both practicable and possible.

**Photographs — admission or rejection — largely discretionary — purpose of — useful to jury.**

6. The admission or rejection of photographs is largely within the discretion of the trial court; and whether they are sufficiently verified or whether they may be useful to the jury are preliminary matters, which are addressed to him.

**Photographs — evidence — purpose and application of rule — aid to jury.**

7. Photographs are received, as merely an aid to the jury in applying the evidence, and if they tend to confuse rather than aid the jury, they should be excluded.

**Photographs — admissibility — must only show true conditions — time of accident.**

8. To be admissible in evidence, photographs should simply show conditions existing at the time in question, and photographs which show more than this, and with men in various assumed situations, in order to illustrate the claims and contentions of the parties, should not be admitted.

**Doctrine of res ipsa loquitur — application of — accident — action — time of bringing — apparatus used not produced — excuse.**

9. The doctrine of *res ipsa loquitur* will apply, where the accident occurs through the breaking of a steel cable 300 feet in length, and where such cable is not produced upon the trial by the defendant, nor is any proof introduced of its condition or inspection prior to the accident, and the action was begun within three months of the time when such accident occurred, and the only excuse for its nonproduction is that counsel does not know where it is.

**Negligence — master — injury — proximate cause — mingling with negligence of others — rule.**

10. If the negligence of the master, or of one for whose conduct the master is answerable, mingles with that of one who stands in the relation of a fellow servant to the servant receiving the injury, or if the negligence of the master or his representative is the proximate or efficient cause of the injury, the master will be liable, and will not be allowed to escape liability on the ground that the injury also proceeded from the negligence of one for whose conduct he was not answerable.

**Evidence — withholding — failure to produce — available — presumption. — inference by court.**

11. The mere withholding or failure to produce evidence, which under the circumstances would be expected to be produced, and which is available, gives rise to a presumption against the party withholding it. The courts recognize and act upon the natural inference that the evidence is held back under such circumstances because it would be unfavorable.

**Pleadings — elimination of questions raised by — request — failure to make — effect.**

12. Where the defendant does not ask the court to eliminate questions which are raised in the pleadings from the jury's consideration, he cannot complain that an issue raised by such pleadings is improperly submitted to the jury.

**Contributory negligence — assumption of risk — defense of — burden of proof.**

13. The burden of establishing the defenses of contributory negligence and the assumption of the risk is upon the defendant.

**Charge of court — reasonable interpretation — as a whole — presumption. — must present law fairly.**

14. The charge of a court to a jury is entitled to a reasonable interpretation. It is to be construed as a whole, in the same connected way in which it is given, and upon the presumption that the jury did not overlook any portion that gave due weight to it as a whole. If, when so construed, it presents the law fairly and correctly, and in a manner not calculated to mislead the jury, it will afford no ground for reversing the judgment, although some of its expressions if standing alone might be regarded as erroneous, because there may be an apparent conflict between isolated sentences, or because some one of them, taken abstractly, may have been erroneous.

Opinion filed April 29, 1915.   Rehearing denied July 2, 1915.

Appeal from the District Court of Burleigh County, *Nuessle*, J.

Action for personal injuries. Judgment for plaintiff. Defendant appeals.

Affirmed.

Statement of facts by BRUCE, J.

This action was brought to recover damages for personal injuries sustained by the plaintiff, while in the defendant's employ in the construction of the McKenzie Hotel in Bismarck, in the month of November, 1910. The case was first tried before a court and a jury in June, 1911. At the conclusion of the evidence and on the defendant's motion, a verdict was directed in his favor. On an appeal being taken, this judgment was reversed. (See Wyldes v. Patterson, 24 N. D. 218, 139 N. W. 577.) The case was retried in June, 1913. At the conclusion of the evidence, the defendant again moved the court to direct a verdict in his favor, on the grounds that: "(1) The evidence fails to disclose actionable negligence on the part of the defendant; (2) it conclusively appears from the evidence that the plaintiff assumed the risk, and was guilty of contributory negligence; (3) it conclusively appears from the evidence that, if the plaintiff did not assume the risk and was not guilty of contributory negligence, the injuries were caused either by unavoidable accident or by the negligence of the engineer, who was a fellow servant."

This motion was denied and the case submitted to the jury, which found a verdict in favor of the plaintiff, and assessed his damages at the sum of $2,500, with interest. From the judgment entered upon this verdict, this appeal is taken.

*P. J. McLaughlin* and *H. C. Bradley,* for appellant.

The mere fact that an injury is caused by defective appliance does not prove negligence, unless the defect is of such a nature that reasonable prudence and ordinary care ought to have discovered it. Meehan v. Great Northern R. Co. 13 N. D. 432, 101 N. W. 183.

When the master has performed his whole duty to the servant, recovery is denied for an injury to the servant in the employment, not because of his assumption of the risk, but because he never had any cause of action, for his cause of action would necessarily be based upon his employer's negligence, and where there is no negligence, there can

be no recovery. Naylor v. Chicago & N. W. R. Co. 53 Wis. 661, 11 N. W. 24; Stephenson v. Duncan, 73 Wis. 406, 9 Am. St. Rep. 806, 41 N. W. 337; Gilbert v. Guild, 144 Mass. 601, 12 N. E. 368; Sullivan v. India Mfg. Co. 113 Mass. 398, 15 Am. Neg. Cas. 527.

Railroad companies are negligent when they fail to block frogs; but where a brakeman or switchman knows of the failure in that respect, he assumes the risk, and cannot recover. Mayes v. Chicago, R. I. & P. R. Co. 63 Iowa, 562, 14 N. W. 340, 19 N. W. 680; Appel v. Buffalo, N. Y. & P. R. Co. 111 N. Y. 550, 19 N. E. 93; Ireland v. Gardner, 54 Hun, 634, 7 N. Y. Supp. 609; St. Louis, I. M. & S. R. Co. v. Davis, 54 Ark. 389, 26 Am. St. Rep. 48, 15 S. W. 895; Grand v. Michigan C. R. Co. 83 Mich. 564, 11 L.R.A. 402, 47 N. W. 837; Way v. Illinois C. R. Co. 40 Iowa, 341, 14 Am. Neg. Cas. 621; Anderson v. Minnesota & N. W. R. Co. 39 Minn. 523, 41 N. W. 104; O'Keefe v. Thorn, 2 Monaghan (Pa.) 73, 16 Atl. 737; Crowley v. Pacific Mills, 148 Mass. 228, 19 N. E. 344; Townsend v. Langles, 41 Fed. 919; Hickey v. Taaffe, 105 N. Y. 26, 12 N. E. 286; Clark v. St. Paul & S. C. R. Co. 28 Minn. 128, 9 N. W. 581, 16 Am. Neg. Cas. 280; Raines v. St. Louis, I. M. & S. R. Co. 71 Mo. 164, 36 Am. Rep. 459; Brossman v. Lehigh Valley R. Co. 113 Pa. 490, 57 Am. Rep. 479, 6 Atl. 226; Hughes v. Winona & St. P. R. Co. 27 Minn. 137, 6 N. W. 553; Larson v. St. Paul, M. & M. R. Co. 43 Minn. 423, 45 N. W. 722; Larson v. Knapp, S. & Co. 98 Wis. 178, 73 N. W. 992; Cleary v. Dakota Pkg. Co. 71 Minn. 150, 73 N. W. 717, 1099; Powell v. Ashland Iron & Steel Co. 98 Wis. 35, 73 N. W. 573; Walsh v. St. Paul & D. R. Co. 27 Minn. 367, 8 N. W. 145; Hayball v. Detroit, G. H. & M. R. Co. 114 Mich. 135, 72 N. W. 145; Soderstrom v. Holland Emery Lumber Co. 114 Mich. 83, 72 N. W. 13; Lundberg v. Minneapolis Iron Store Co. 115 Minn. 174, 131 N. W. 1016; Olson v. McMullen, 34 Minn. 94, 24 N. W. 318; Martin v. Chicago, R. I. & P. R. Co. 118 Iowa, 148, 59 L.R.A. 698, 96 Am. St. Rep. 371, 91 N. W. 1034, 10 Am. Neg. Rep. 592; Swanson v. Great Northern R. Co. 68 Minn. 184, 70 N. W. 978, 2 Am. Neg. Rep. 578; Quick v. Minnesota Iron Co. 47 Minn. 361, 50 N. W. 244; Scharenbroich v. St. Cloud Fibre-Ware Co. 59 Minn. 116, 60 N. W. 1093; McCutcheon v. Virginia & Rainy Lake Co. 114 Minn. 226, 130 N. W. 1023; Mackin v. Alaska Refrigerator Co. 100 Mich. 276, 58 N. W. 999; Com. v. Pierce, 138 Mass. 176, 52 Am. Rep. 264, 5 Am. Crim. Rep. 391.

Conceding that there were well-known instrumentalities for his protection, whatever the ethical obligation of the employer might be to furnish them, under the law, the servant may waive that performance by engaging to do the work without the same. Nelson v. Kelso, 91 Minn. 77, 97 N. W. 459; Williams v. Bunker Hill & S. Min. & Concentrating Co. 190 Fed. 79; Wilson v. Lake Shore & M. S. R. Co. 145 Mich. 509, 108 N. W. 1021; Beleal v. Northern P. R. Co. 15 N. D. 318, 108 N. W. 33, 20 Am. Neg. Rep. 453, 11 Ann. Cas. 921; Carlson v. Sioux Falls Water Co. 8 S. D. 47, 65 N. W. 419; Hunt v. Kile, 38 C. C. A. 641, 98 Fed. 49; Bartley v. Howell, 82 Minn. 382, 85 N. W. 167; Buckley v. Gutta Percha & Rubber Mfg. Co. 113 N. Y. 540, 21 N. E. 717, 16 Am. Neg. Cas. 842; Berger v. St. Paul, M. & M. R. Co. 39 Minn. 78, 38 N. W. 814, 16 Am. Neg. Cas. 251; Hefferen v. Northern P. R. Co. 45 Minn. 471, 48 N. W. 1, 526, 16 Am. Neg. Cas. 254; Mississippi River Logging Co. v. Schneider, 20 C. C. A. 390, 34 U. S. App. 743, 74 Fed. 195; Dunn v. Great Lakes Dredge & Dock Co. 161 Mich. 551, 126 N. W. 833; Kraczek v. Falk Co. 142 Wis. 570, 126 N. W. 30; Ward v. Scott, 182 Mass. 170, 64 N. E. 968; Bauer v. American Car & Foundry Co. 132 Mich. 537, 94 N. W. 9; Sweet v. Ohio Coal Co. 78 Wis. 127, 9 L.R.A. 861, 47 N. W. 182; Johnson v. Hovey, 98 Mich. 343, 57 N. W. 172; Williams v. J. G. Wagner Co. 110 Wis. 456, 86 N. W. 157; Upthegrove v. Jones & A. Coal Co. 118 Wis. 673, 96 N. W. 385, 14 Am. Neg. Rep. 670; McCarthy v. Mulgrew, 107 Iowa, 76, 77 N. W. 527; Vanderpool v. Partridge, 79 Neb. 165, 13 L.R.A.(N.S.) 668, 112 N. W. 318; Porter v. Ocean S. S. Co. 113 Ga. 1007, 39 S. E. 177; Evans Laundry Co. v. Crawford, 67 Neb. 153, 93 N. W. 117, 94 N. W. 814, 13 Am. Neg. Rep. 355; Martin v. Detroit Lumber Co. 141 Mich. 363, 104 N. W. 692; Thompson v. Missouri P. R. Co. 51 Neb. 527, 71 N. W. 61, 3 Am. Neg. Rep. 53; New Omaha Thompson-Houston Electric Light Co. v. Rombold, 73 Neb. 272, 102 N. W. 475, 106 N. W. 213; Yess v. Chicago Brass Co. 124 Wis. 406, 102 N. W. 932; Brazil Block Coal Co. v. Hoodlet, 129 Ind. 327, 27 N. E. 741; Cudahy Packing Co. v. Marcan, 54 L.R.A. 258, 45 C. C. A. 515, 106 Fed. 645, 9 Am. Neg. Rep. 670; Storrs v. Michigan Starch Co. 126 Mich. 666, 86 N. W. 134; Boss v. Northern P. R. Co. 2 N. D. 136, 33 Am. St. Rep. 756, 49

N. W. 655; Songstad v. Burlington, C. R. & N. R. Co. 5 Dak. 522, 41 N. W. 755.

The engineer, in doing the work in which he was engaged at the time of the accident, was a fellow servant, for whose negligence the defendant is not responsible. The rule which makes the master liable under such circumstances is harsh and technical, and without the basis of inherent justice. Ames v. Lowry, 30 Minn. 285, 15 N. W. 247; Brown v. Winona & St. P. R. Co. 27 Minn. 162, 38 Am. Rep. 285, 6 N. W. 484; Foster v. Minnesota C. R. Co. 14 Minn. 360, Gil. 277; O'Neil v. Great Northern R. Co. 80 Minn. 27, 51 L.R.A. 532, 82 N. W. 1086; Collins v. St. Paul & S. C. R. Co. 30 Minn. 31, 14 N. W. 60; Jemming v. Great Northern R. Co. 96 Minn. 302, 1 L.R.A.(N.S.) 696, 104 N. W. 1079; Doerr v. Daily News Pub. Co. 97 Minn. 248, 106 N. W. 1044; Lindvall v. Woods, 41 Minn. 212, 4 L.R.A. 793, 42 N. W. 1020, 16 Am. Neg. Cas. 200; Reed v. Stockmeyer, 20 C. C. A. 381, 34 U. S. App. 727, 74 Fed. 186; Lundquist v. Duluth Street R. Co. 65 Minn. 387, 67 N. W. 1006.

A question put to an expert, which requires his opinion upon the exact question which is for the jury to determine, is improper. Taylor v. Grand Ave. R. Co. 185 Mo. 239, 84 S. W. 873; Roscoe v. Metropolitan Street R. Co. 202 Mo. 576, 101 S. W. 32.

The photographs, and testimony in relation thereto, should have been received in evidence, and their rejection was prejudicial error which entitles defendant to a new trial. Mitton v. Cargill Elevator Co. 124 Minn. 65, 144 N. W. 434.

An instruction which gives the jury the right to find a verdict for plaintiff, "if they find that plaintiff has established to their satisfaction that his injury was caused by the defendant's negligence, on any of the grounds charged in the complaint," is erroneous and misleading. It was clearly shown that a signal system was necessary to do the work. The attention of the jury should have been specifically directed to this, and to nothing else. Hunt v. Kile, 38 C. C. A. 641, 98 Fed. 49.

*Andrew Miller* and *W. P. Costello,* for respondent.

Whether the lack of signal system was or was not the proximate cause of the injury was a question for the jury. Before the judge can take the question from the jury and determine it himself, the facts must not only be undisputed, but the inference to be drawn from these

facts must be such that fair-minded men ought not to differ about them. 1 Thomp. Neg. § 161; 21 Am. & Eng. Enc. Law, 508.

If the engineer knew of such condition and was guilty of negligence in acting as he did, knowing the plaintiff's perilous position, this fact would not relieve defendant from liability, because it would simply amount to the combined negligence of the engineer and the defendant. Bode v. New England Invest. Co. 1 N. D. 128, 45 N. W. 197.

It is well settled, that it is the absolute duty of the master to furnish reasonably safe instrumentalities, and that the servant assumes no risks incident to the failure of the master to perform such duty. Cameron v. Great Northern R. Co. 8 N. D. 124, 77 N. W. 1016, 5 Am. Neg. Rep. 454; Cook v. St. Paul, M. & M. R. Co. 34 Minn. 45, 24 N. W. 311, 16 Am. Neg. Cas. 247.

The burden of proving that the injured servant assumed such risks is upon the defendant, and it is a question for the jury. Dowd v. New York, O. & W. R. Co. 170 N. Y. 459, 63 N. E. 541; Johnson v. Griffiths-Sprague Stevedoring Co. 45 Wash. 278, 8 L.R.A.(N.S.) 432, 88 Pac. 193.

The fellow-servant doctrine is here immaterial, because there is ample evidence of defendant's negligence, and that this was the proximate cause of the injury, and was properly submitted to the jury. Ness v. Jones, 10 N. D. 587, 88 Am. St. Rep. 755, 88 N. W. 706; Hall v. Northern P. R. Co. 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas. 960.

An objection must state the ground thereof, and point out specifically the errors of which complaint is made, in order to give opportunity to correct them, in order to be availing. 8 Enc. Pl. & Pr. 163.

It is no objection to a hypothetical question that the state of facts which it assumes is erroneous, if within the probable, or even possible, range of the evidence, since the judge cannot decide, as a preliminary question, an objection to the evidence, whether it is erroneous or not, such question being for the jury. Thomp. Trials, § 608; Harnett v. Garvey, 66 N. Y. 641.

Further, the incompetency of such a question may be remedied by cross-examination. Davis v. State, 35 Ind. 496, 9 Am. Rep. 760.

Opinion evidence from nonexpert witnesses is admitted from necessity, where the facts and conditions upon which the opinion is based

31 N. D.—19.

cannot be adequately described. Enos v. St. Paul F. & M. Ins. Co. 4
S. D. 639, 46 Am. St. Rep. 796, 57 N. W. 919.

Instructions should be based upon the evidence rather than upon
the pleadings. Hughes, Instructions to Juries, §§ 85, 95; Quinn v.
People, 123 Ill. 342, 15 N. E. 46.

An instruction, defective when considered alone, will not be considered
erroneous when the charge as a whole states the law fairly. Gagnier
v. Fargo, 12 N. D. 219, 96 N. W. 841.

BRUCE, J. (after stating the facts as above). The facts in this case
as disclosed upon the second trial are not materially different from
those disclosed upon the former hearing. (See Wyldes v. Patterson,
24 N. D. 218, 139 N. W. 577.) The only material difference seems
to be that the height of the building is more definitely fixed, and is
now, excluding the scroll work of the cornice, which was put on after
the accident, put at 78 feet, $2\frac{1}{2}$ inches, instead of at 70 feet, as upon the
former trial, and in the former appeal. The distance of the west
wall of the engine house from the base of the building is more accurately
measured, but is practically the same as was assumed at the former
hearing, that is to say, 20 feet from the base line of the building. The
size of the frame building is the same as before, namely, 12 or 14 feet
in width and 16 or 18 feet in length; and as the evidence shows that
the engineer must have stood somewhere in the northeast corner of
the engine house, and the engine house was lengthwise and parallel with
the hotel building on Fifth street, such engineer must have stood some-
where within this distance of 14 feet, that is to say, at the most 34
feet from the base of the building, and probably from 30 to 32 feet
therefrom. The length of the engine is shown to have been 10 or 12
feet. The fire box was on the south side of the house, and the drum was
north of the engine. It was 10 feet from the top of the engine to the
top of the boiler. The engine was placed in the southeast corner
of the building, and 25 or 30 feet from the east end of the
building line. The levers which operated the brake were on the
west side of the engineer, "right in front of him," as he was facing
west. The engineer was about 5 feet, 10 inches, tall. In operating
the levers he would face the main building, as a general rule. The
gangway or runway leading from the elevator back onto the roof of the

building was about 3 feet in width, and projected over the edge of the cornice about 6 or 8 inches, so that when the elevator was brought up to the roof, its edge connected closely with the projecting end. It seems to have been level from the elevator platform back onto the roof for some 4 feet, 8 inches, or 4 feet, 10 inches.

Defendant bases his argument as to the insufficiency of the evidence largely upon the proposition that the evidence shows that the plaintiff could have been easily seen upon the platform of the elevator, and, in turn, could have easily seen the engine house. Much confusion, however, has been interjected into the case by counsel for appellant failing to distinguish between the inability to see the platform of the elevator and the landing or top of the roof of the building. When the words "landing" or "platform" are spoken of, they cannot possibly be the few inches of boarding which extended between the roof and the elevator, for that in no sense was a "landing." The evidence of the witness O'Connor directly supports the theory of the plaintiff in this case, for he positively states that, standing even a little further away from the building than the engineer must have stood, he could see a man on the elevator or standing on the roof waiting for the elevator, but could not see a man while about to push a wheelbarrow upon the elevator. This fact is borne out also, conclusively, by the testimony of the witness Bliss, and by the established rules of optics and mathematics, which counsel for appellant seeks to ridicule in his brief and in his argument, but which, after all, constitute the only sure and certain method of proof. All the witnesses and photographs in the world, indeed, cannot change mathematical truths. As a matter of fact, no testimony was necessary at all, as to the distance back upon the roof-top that the plaintiff could have been seen. The height of the building, and the height of the plaintiff, and the distance of the engineer from the building, are established factors in the case, and the court could have taken judicial notice of the established truths of mathematics, and could have instructed the jury upon the proposition. It would really have been better for counsel to have sought to prove an error in the mathematical computations, if such he could have done, rather than to have wasted his efforts in sarcasm and in the introduction of testimony which was necessarily inaccurate. The witness Bliss, an experienced

civil engineer, and the state engineer of the state of North Dakota, testified as follows:

Q. Now, if you are given a height, the height of say a building, and the distance from that building a man is standing on the ground, and given the height of the man, and you are further given the distance back from the roof line of the building, on the roof of which an object is placed, can you determine mathematically the height it is necessary that that object be before it can be seen by the man?

A. I can.

Q. Suppose, Mr. Bliss, that a man is standing on a building 79 feet and 5 inches high, and is standing back 2 feet from the roof line, and on the ground below him is standing another man exactly 20 feet out from this roof line, the man is 5 feet, 10 inches, high, giving him a line of vision of about 5 feet and 6 inches, how high would the object on the roof have to be before it would come within the range of his vision?

A. Seven feet and 5 inches.

Q. If the man was standing out from that roof line 25 feet, how high would he have to be before he came within the range of vision of the man on the street? How high would the man on the roof have to be?

A. The conditions being the same, except that he was 25 feet out, the height would be 5 feet, 11 inches.

Q. As I understand it, in order to see the top of his head, he would have to be in one case 7 feet and 5 inches, and in the other case 5 feet and 11 inches. Now, suppose that the man standing on the top of the roof stood 1 foot back of the roof line, instead of 2, and the man on the street was 20 feet out, how high would he have to be?

A. Three feet, $8\frac{1}{2}$ inches.

Q. So it would appear that whether the man stood 1 foot back or 2 feet back from the roof line would make a great deal of difference?

A. It would.

Q. Make a difference of from 7 feet, 5, to 3 feet, $8\frac{1}{2}$?

A. Yes.

Q. Now, if the man on the roof stood $2\frac{1}{2}$ feet back from the edge of

the roof line, and the man on the street stood 20 feet out from the roof line, how high would a man have to be?

A. Nine feet and 3 inches.

Q. Now, assume that the man on the street was 25 feet out from the roof line, and the man on top was back $2\frac{1}{2}$ feet?

A. Seven feet and 10 inches.

Q. Now assume that the man on the roof was 2 feet back from the roof line, and the man on the street was 30 feet out?

A. Four feet, 11 inches.

Can you tell the jury, briefly, the process and method of determining the facts you have testified to?

A. Could I refer to the chart?

Q. Yes. I show you plaintiff's exhibit E, and ask you to tell what it is briefly. Tell what it is.

A. A diagram, drawn to scale, representing the line of vision of a man looking up the side of a building.

Q. And prepared, is it, mathematically, according to the rules of mathematics in which you determine proportions and angles? By reference to that exhibit can you briefly illustrate to the jury the method and manner in which you arrived at the facts you have testified to?

A. I can.

Q. You may do so.

Objection by counsel. Sustained.

Cross-examination: Q. Assuming a building, the height that has been mentioned, 100 feet in length along the sides, and assume a line, drawn at a distance on the street or ground, of 20 feet, parallel with the building itself. Would it make any difference what part of that line the person on the ground should stand on, in making observations of any point on the top of the building?

A. The line is drawn parallel to the building, 20 feet out?

A. So long as a person's height of vision remains unchanged, the result is the same.

Q. So far as the location of the person on the ground is concerned, provided he is 20 feet out from the building itself, his line of vision would be precisely the same?

A. His line of vision would change in a plane in this manner, but the height of the object will be absolutely the same.

Q. What difference, if any, would there be, so far as the man is concerned, what difference would there be in his powers of observation of the man on the roof?

A. He might be farther away in one case than in the other.

Q. If he were standing directly out 20 feet, he would be nearer than if he stood on the same line 100 feet away?

A. That is what I mean.

Q. But that is only limited to the power of observation, and not to the scope? What I mean is, does it limit in any way the scope of the observation?

A. It does not.

Q. So what you mean is simply a limitation of the power of the eye?

A. That is all.

Q. And if you take a building 100 feet in length, and draw this line parallel with the building, 20 feet out from the building line, the power of the eye would not be affected in viewing it from any angle along that line?

A. I should not think so—materially.

Q. It makes no appreciable difference, so you could fairly say that so far as the location is concerned out from the building it makes no difference, say for a distance of 100 feet, whether you are viewing it 20 feet north or south of the given point, and assuming now that the building runs in a northerly and southerly direction?

A. It would make no difference in the height of the man on the top.

Q. You work the problem by a system of angles, do you?

A. A system of proportion.

Q. In order to get the proportion, what do you do with your angles?

A. I have similar angles, equal angles, I have the geometrical—

Q. What angles did you use in your computation?

A. I have a straight line cut by two parallel lines giving me equal angles, right angles. Right angled triangles having one angle equal are similar triangles.

Q. Now, in addition to what you have now stated, the explanation you made to the jury shows exactly how you arrived at the figures that you gave us?

A. Yes, sir.

Q. There is not anything that you have omitted?

A. No, sir. I have omitted nothing.

It is true that this testimony is limited to a building of the height of 79 feet and 5 inches, while there is evidence that the scroll work, 1 foot, 2½ inches in height, was not put on until after the accident, and the height was, therefore, probably then only 78 feet, 2½ inches. It is also true that there is some evidence that the east wall of the engine house was 34 feet from the base of the building, and that the engineer must have stood somewhere in the southeast corner of that building. It is, however, true, that the cornice projected 3 feet from the building and out from the base thereof, and that therefore the east wall of the engine house could at the most have only been 31 feet from the line of the cornice, and the engineer, if standing as he said he did, in front of his engine, must have been at least 2 feet from that wall, and that therefore, at the very most, we have the problem of the range of vision of a man 5 feet, 10 inches, high, standing 29 feet from the base of the line of a building which is 78 feet, 2½ inches, in height; and as to the results of that problem, and as to its mathematical conclusions, both this and the trial court could and must take judicial notice. These conclusions point inevitably to the fact that the witnesses for the defendant were careless in their measurements and observations, and were radically mistaken, and that the photographs are absolutely unreliable. It seems hardly necessary, in this age of universal education, to go further into detail; but counsel for appellant appears to so strenuously favor guesswork as a right and rule of law, as opposed to mathematical truths, and to so scrupulously refuse to enter into any mathematical computation himself, that it seems necessary that the figures should be given. The problem is an easy one; and unless it be contended that one can look through a brick wall, its conclusions are irresistible.

Let us suppose first that the plaintiff, when bending down to his wheelbarrow, was standing 3 feet from the edge of the cornice.

The height of the building is 78 feet, $2\frac{1}{2}$ inches. The line of vision of a man 5 feet, 10 inches, tall upon the ground would be about 5 feet, 6 inches. C B therefore=78 feet, $2\frac{1}{2}$ inches—5 feet, 6 inches=72 feet, $8\frac{1}{2}$ inches. C D=3 feet. A B=29 feet. The triangles C D E and A B C are similar. $\therefore \dfrac{E\ D}{C\ D} = \dfrac{C\ B}{A\ B}$. $\therefore E\ D = \dfrac{72\ ft.\ 8\frac{1}{2}\ in.}{29\ feet}$. $\therefore E\ D =$ 3 ft. $\times \dfrac{72\ feet\ 8\frac{1}{2}\ in.}{29\ feet}$. $\therefore E\ D$=7 feet, $6\frac{1}{4}$ inches.

If we take the distance of the man from the edge of the roof as being 2 instead of 3 feet, and follow the same method of computation, we find that E D (the height that such man must be in order to be seen) is 5 feet, 4 inches. If we take the distance at 1 foot, we find that the height must have been 2 feet, 6 inches. It goes without saying that; if the distance from the base of the building was less than 29 feet, the height of the man on the roof must have been correspondingly greater. It is also well to observe how much difference even a foot upon the roof makes in the result of the problem. Stewart v. St. Paul City R. Co. 78 Minn. 110, 80 N. W. 855, 7 Am. Neg. Rep. 80.

Counsel, we know, seeks to discredit these plain mathematical truths and the value of mathematical computation, by stating that there is a discrepancy between the results of the state engineer and those given in the former opinion. If this were so, it would have been an easy thing for counsel and the trial judge to have figured out the true solution. We think, however, that if he will allow 3 feet for the projecting cornice, which we did in our former opinion, and which the state engineer was not asked to allow for in the hypothetical questions put to him, he will find that no material discrepancy exists. We thus have an absolute mathematical demonstration of the fact that the down signal on which the engineer relied was entirely inadequate, and this for the simple reason that it could not be seen. It is also clear that the engineer relied upon this imagined signal, for he positively testifies that he lowered the elevator in response thereto. It is also clear that the plaintiff knew nothing of the signal, and that the foreman on the roof positively testified that it had been discontinued as the building rose in height. It, too, is clear, that this reliance of the engineer on the imagined down signal, and the confusion which resulted therefrom, was the fault of the master, in not providing a definite system of signals, and making them known to those concerned. These facts totally negative any defense which could have been based upon the doctrine of the assumption of the risk. It is well established that a servant only assumes those risks of which he is aware and appreciates. The plaintiff, indeed, had the right to believe that, no system of signals being provided, the engineer would give him plenty of time to get clear of the elevator, and would not lower the elevator until this opportunity had been afforded. The engineer, on the other hand, imagined that a system of signals was provided for, and naturally would take any real or imagined lowering of the hand as such signal. This risk and confusion the plaintiff did not assume.

We, no doubt, as has been argued by counsel for appellant, overstated the rule as to the assumption of the risk, when, in our former opinion (see Wyldes v. Patterson, 24 N. D. 218, 139 N. W. 577), we said that "the employee is not under any of the cases held to assume the risk of a breach of duty which is personal to the employer," and should have qualified this statement by saying: "unless the servant knows, or in the exercise of due care should have known of the danger,

and voluntarily encounters it." It is no doubt true "that an employee must not rashly or deliberately expose himself to unnecessary and unreasonable risks, *which he knows and appreciates."* See Cook v. St. Paul, M. & M. R. Co. 34 Minn. 45, 24 N. W. 311, 16 Am. Neg. Cas. 247, But where is there any evidence in the record, that the plaintiff knew of the fact that the cable was defective and that the foreman had ordered the discontinuance of signals, which *the engineer and the proprietor* of the building *still believed to be in operation,* or that he in any way assumed the risk of the conflict and confusion ?

The evidence is clear, that it was the failure to provide for a system of signals, or to make it sufficiently understood that no system was provided for, that caused the plaintiff to fall upon the elevator. The engineer, Orcott, testified that he lowered the elevator in response to a down signal; while the evidence is also quite convincing that the man on the roof was justified in believing that no such signal was to be given, and that such engineer would wait until the barrow was completely placed upon the lift and he had stepped back therefrom, and that until then there was no danger of the elevator being lowered.

The engineer, Orcott, testifies:

Q. You may tell the jury in your own way what you know about the action, Mr. Orcott, coming down to the time of the accident.

A. Well, Mr. Larson went upon the building—up on the elevator— and as he stepped off the elevator and on to the runway and out of my sight, Mr. Wyldes hauled a wheelbarrow out on the elevator and stepped back where I could see him. He gave me the signal to go down, and stepped back out of my sight; and as I started down the top was just about even with the cornice, and he came rushing out there. I did not know what he was doing, or anything else. Didn't know whether he was going to jump off or not, and he grabbed around the corner of the elevator, and as he grabbed around the corner, he let go of that and grabbed on to the cable of the elevator, and, as he did that, I stepped on the brake. I stepped on the brake about the time his body struck the elevator.

Q. Did he fall?

A. Went over the cornice, right on to the elevator.

Q. That is the time you applied the brake?

A. Yes, sir.

Q. You applied your lever also, as well as the brake?

A. Yes, sir.

Q. And I think you have already testified that you stopped suddenly?

A. Yes, sir.

Q. You stopped the descent of the elevator?

A. Stopped the descent just the same as I would at any time.

Q. Then the break followed.

A. Yes.

Q. Now, did you plainly see the young man come with his wheelbarrow.

A. Yes, sir.

Q. Did you see him plainly—see him put it into the elevator?

A. Yes, sir.

Q. Did you plainly see him step back again?

A. Yes, sir.

Q. And give the signal?

A. Yes, sir.

Q. And then you operated your engine, in response to the signal?

A. I did.

Q. And that is how the accident happened?

A. Yes, sir.

We realize that counsel for appellant says that "considered from another point of view, it seems to us this court must be persuaded that the engineer could and did see the landing, and the man on the roof in attendance upon the elevator. . . . Is it believable," he asks, "that the engineer was located in a position where he could not see the landing, or the men putting material or wheelbarrows into or taking them from the elevator, so that he must of necessity hoist and lower blindly, and by chance or guess, without a signal, regardless of the consequences? Is not the mere statement of such an absurd proposition its best refutation? Can it be believed, that during the construction of the building the elevator was running amuck, without inflicting injury or death, hourly or daily, upon those who were called upon to use it? The engineer had successfully and safely operated the elevator up to the time of the accident, and for three weeks after the cornice was constructed. The man on the roof was putting material or wheel-

barrows into the elevator, passing from 6 to 8 inches out over the end
on each occasion. In taking the wheelbarrows from the elevator, we
have seen that it was necessary to pass over the wheelbarrow to the
opposite side, in order to reach the handles and push it out, and these
operations were performed every few minutes. If the engineer could
not see the man place the wheelbarrow in the elevator, how could he
know when or how to hoist or lower? If he was operating blindly, why
did he not frequently lower the elevator when the man on the roof
was in the act of stepping into or out of it? Was blind chance always
responsible for the safety of a man on the roof? What prevented
daily or hourly accidents? How could he stop the elevator on a
level with the runway, as the complaint alleges, and the proof shows?"
We, however, are led to the serious conclusion that blind chance was
relied upon; and the questions submitted by counsel both ignore impor-
tant factors in the case, and emphasize those which are unimportant.

The fact that in pushing a wheelbarrow off the elevator the plaintiff
had to climb over it and on to the elevator, and in such a position would
be clearly in view of the engineer, has nothing to do with the case at
bar, or with the situation before us; though, on the other hand, this
fact, and the half-security afforded thereby, might have furnished a
reason for any alleged negligence and lack of precaution taken when
the plaintiff was engaged in returning the empty wheelbarrow. Nor
does the fact that the gangway protruded over the roof some 6 or 8
inches have any material effect on the case. The plaintiff was not
taking the wheelbarrow off, but was putting it on. When putting it on,
as a mathematical certainty, he could not be seen until he was within
2 feet of the elevator, even if he was standing upright, and not bending
down as he must have been in pushing the wheelbarrow, and not until
all of the wheelbarrow was fairly placed on the elevator. It is also
clear that every inch that the plaintiff approached the edge of the roof
made a material difference in the problem of the height at which he
could be seen. This is not merely borne out by the mathematical com-
putations, but is exactly the testimony of the witness O'Connor. He
could see a man standing on the edge of the roof waiting for the elevator.
When the wheelbarrow was being pushed upon the elevator, and the
man was necessarily bending down and was necessarily standing some
2 or 3 feet at least back, as the evidence in this case shows that the

elevator was dropped before the wheelbarrow was fully placed thereon, he could not see the man. In other words, that on account of the distance from the edge of the roof and his decreased height, on account of his bending down, the man was outside of the range of vision. The testimony of the witness O'Connor is as follows:

Q. What was your view—standing inside of the engine house and looking up at the elevator, the top of the elevator at the roof; I will ask you to describe the view of the men working up there with the wheelbarrows, as far as you could see?

A. You mean the men putting the barrows on to send them down?

Q. The men who were putting them on and taking them off the elevator lift?

A. You could see the barrow come out with the big flange and elevator come down, and that is all you could see.

Q. Now, standing in that position, Mr. O'Connor, when a wheelbarrow was being placed on the lift, could you see the man placing it there?

A. Well, you couldn't, no; you could see it sometimes. You could see one waiting for the barrow to come up.

Q. I am speaking now of when a man came out and rolled an empty wheelbarrow, for instance, on the elevator, off the roof and on to the elevator and placed it there, could you see him placing the wheelbarrow on the elevator?

A. Not from the engine house, you couldn't.

Q. Now, you know the position occupied by the engineer in the engine house?

A. I know about—I don't know exactly, never was in there.

Q. Now, where you stood at the side of the building, in the position which you describe, how far were you at that time from where the engineer stood?

A. I should judge about probably 3 or 4 feet. He stood there by the drum, operating the levers. I was just outside. I used to look in at him once in a while.

Q. You were about 3 or 4 feet farther out from the main building?

A. No, I was standing against the building, and he was inside.

Q. You were 3 or 4 feet farther away from the main building of the hotel than the position occupied by the engineer?

A. More than that, probably.

This is also made perfectly clear by the testimony of the defendant's witness, Fred Swanson. He testifies that when he was standing on the roof and making the signals, he was only a foot from the edge of the cornice. He also testified that when he moved back another foot he could hardly see the camera; that he could barely see the top of it. This witness also testifies that no one but the engineer told him of the signals, and that the foreman said nothing about them. Nor is the evidence of the defendant Patterson in any way contradictory. Neither are the photographs themselves, if permitted in evidence, contradictory to the mathematical facts, or to the testimony of the witness O'Connor. Defendant testified as to what he could see from the street, but naturally could not testify as to the distance that Larson was standing back from the edge of the roof. All that he could say was, "I should judge about 2 or 3 feet," and this is purely guesswork. As we have before shown, the distance of a few inches makes a material difference in the line of vision. So, too, the photographs show a person standing up on the edge of the cornice, who is standing up, and not bending down, as the plaintiff must have been when he was placing the wheelbarrow in the elevator.

These facts disprove any presumption of error arising from refusing to admit in evidence the photographs which were offered by the defendant. The photographs could have served no other purpose than to illustrate the fact as to how far back the plaintiff could have been seen upon the roof. The mathematical demonstration that we have made absolutely establishes that fact. There was absolutely no necessity for the court and counsel to waste hours, in seeking to demonstrate that which could have been proved in five minutes by the use of a lead pencil, and that of which the court would have been justified in taking judicial notice. The photographs could have had no other purpose than to mislead the jury. They were certainly not accurate, and they were not taken at the time of the accident. The man on the roof was standing up instead of bending forward. The photograph of a man when standing 1 or 2 feet from the edge and in an upright position is not a photo-

graph of a man bending forward and 3 feet from the edge, as the plaintiff must have been.; nor is a photograph of a man giving a signal a photograph of a man bending down and giving no signal; nor have we any assurance of the fact that the man on the roof when the photograph was taken actually maintained the position and distance from the edge which he was supposed to and should have maintained. Stewart v. St. Paul City R. Co. 78 Minn. 110, 80 N. W. 855, 7 Am. Neg. Rep. 80.

Not only is this so, but photographs are obviously secondary evidence. "Where an inspection of the object is proper, *but impracticable,* a photograph of it may be exhibited to the witnesses as an aid to identification, and may be admitted in evidence." Thomp. Trials, § 869. *"Where an inspection of the premises is proper, but impracticable* or impossible, a photographic view of it is admissible." Omaha Southern R. Co. v. Beeson, 36 Neb. 361, 54 N. W. 557. The rule announced is merely an announcement of one of the most elementary and fundamental rules of evidence. Surely a photograph of an object is not admissible, unless the object itself would be admissible, if available; nor should a jury be permitted to see a photograph of certain premises, unless it were proper for the jury to inspect the premises, if it were practicable and possible to do so. In the case at bar, the photographs offered were not taken at the time of the accident, but were taken only the day before they were offered in evidence. The building photographed was in the same city where the suit was being tried, and only two blocks from the courthouse, where the court was held. Obviously, if defendant desired to have the jury get a correct view of the building as it then existed, the very best evidence would have been the building itself, and no application was made to have the jury view the premises, and apparently this was not desired. How can it be said that the trial court erred in excluding the photographs, when the building itself, the best evidence, was situated within 800 or 900 feet of where the court was being held? It seems to us that the answer is obvious. Assuming that a photograph of the plaintiff taken during the trial had been offered to show his physical appearance at that time, would any one dare to assert that the exclusion of such photograph would have been error? Here, however, it is asserted that the exclusion of a photograph of a building then in existence, and within sight of the court and jury

every time they stepped out of the courthouse, deprived the defendant of some substantial right. It seems to us that the contention is so wholly untenable as to be worthy of very little serious consideration.

The admission or rejection of photographs is largely within the discretion of the trial court. Whether they are sufficiently verified, and whether they may be useful to the jury, are preliminary questions addressed to him. Jameson v. Weld, 93 Me. 345, 45 Atl. 299; Whaley v. Vidal, 27 S. D. 642, 132 N. W. 248; Everson v. Casualty Co. 208 Mass. 214, 94 N. E. 459; Carey v. Hubbardston, 172 Mass. 106, 51 N. E. 521; Verran v. Baird, 150 Mass. 141, 22 N. E. 630. The accident took place on November 15, 1910; the photographs were taken in June, 1913. At the time of the accident the building was in process of construction. When the photographs were taken, the building was completed; a sidewalk had been constructed, and the street graded. The atmospheric conditions were entirely different. It seems clear to us that the photographs would have been of no aid to the jury, but rather would have misled them. Photographs are received in evidence, to aid the jury in applying the evidence. If they tend to confuse, rather than to aid, they should be excluded. Photographs showing the building in the course of construction,—as it was at the time of the accident,—with the scaffolding still there, were already in evidence. The photographs offered by the defendant could have been of no aid to the jury in determining the facts with reference to the accident, and hence were properly excluded. Iroquois Furnace Co. v. McCree, 191 Ill. 340, 61 N. E. 79; 17 Cyc. 419; Elliott, Ev. § 1263. See also Baustian v. Young, 152 Mo. 317, 75 Am. St. Rep. 462, 53 S. W. 921; Goldsboro v. Central R. Co. 60 N. J. L. 49, 37 Atl. 433, 2 Am. Neg. Rep. 408.

The photographs, also, were clearly inadmissible for another reason. They show, not only the building as completed, but they also show *a man standing on the roof.* The preliminary questions asked by defendant's counsel show that these photographs were offered, not for the purpose of presenting a view of the premises, but rather *for the purpose of illustrating a hypothetical situation, and to explain the theories of defendant's attorney with reference to the matter in controversy.* Among the preliminary questions asked of the photographer was: "Q. You may state whether you took the view of a man standing

back from the edge of the cornice with his hand outstretched or making signals?" It is not contended that the person in the photograph or the photographer saw the accident, and even if they had, they would not be permitted to prepare photographs illustrating a hypothetical situation. The rule is well settled that such photographs are inadmissible under any and all circumstances. "Photographs are not admissible in evidence merely to illustrate a hypothetical situation, or to explain the theories of a party as to the matter in controversy." 9 Enc. Ev. 779. As was said by the supreme court of Maine in the case of Babb v. Oxford Paper Co. 99 Me. 298, 302, 59 Atl. 290, 292: "To be admissible, photographs should simply show conditions existing at the time in question. *But photographs taken to show more than this, with men in various assumed postures, and things in various assumed situations, in order to illustrate the claims and contentions of the parties, should not be admitted. An examination of the excluded photographs shows that they fall within the latter class.* They would serve merely to illustrate certain theories of the defendant, as to how the accident happened. They were properly excluded as a matter of law." See also Fore v. State, 75 Miss. 727, 23 So. 710; Buck v. McKeesport, 223 Pa. 211, 72 Atl. 514; People v. Maughs, 149 Cal. 253, 86 Pac. 187. And in the case of Field v. Gowdy, 199 Mass. 568, 19 L.R.A. (N.S.) 236, 85 N. E. 884, in considering a somewhat similar question, it was said: "The defendant, having offered to show that, since the accident to the plaintiff, there had been no change in any of the material facts on the face of the earth, proffered a photograph taken in the course of the trial during a rainstorm of much greater severity than any occurring near the time of the accident, for the purpose of showing the direction taken by water thrown from the spout, and after it reached the defendant's walk, and that such water could not and did not flow to the public walk. To the exclusion of this evidence the defendant excepted. The ground of this ruling is not stated. A photograph of the place, when there was no storm, was admitted in evidence. That excluded was at best a photograph of an experiment. *A photograph has no higher character as evidence than the experiment itself.* Whether the conditions were sufficiently similar to make the observation of any value in aiding the jury to pass upon the issue submitted to them was *primarily for the trial judge to determine as a matter of*

31 N. D.—20.

*discretion.* His decision in this respect will not be interfered with, unless plainly wrong. Such observations and experiments, though sometimes admitted, have often been excluded, in the discretion of the presiding judge." In the case of Stewart v. St. Paul City R. Co. 78 Minn. 110, 80 N. W. 855, 7 Am. Neg. Rep. 80, the supreme court of Minnesota, in an opinion written by the distinguished jurist, Judge Mitchell, in discussing the admissibility of a photograph, said: "In this case, not only had the hole been filled up, but the car had been removed, and the defendant attempted to reproduce the former condition of things. The value, if any, of the photograph, depended upon the fact that the condition existing when it was taken was an exactly accurate reproduction of the condition existing when the accident occurred. *An error of a single foot in the location of the car or of the hole might render the photograph very misleading to the jury.* A photograph may be a correct representation of a place, and yet, from a variety of causes, be very misleading as to distances or to the relative size or location of objects. In this case, a photograph would have had no real value as demonstrative evidence. *Given the exact location of the hole and of the car at the time of the accident, the distance and direction of the one from the other was a mere mathematical problem, to be solved by a measurement on the face of the earth.* The photograph could in on way aid in this matter. Its only effect would be to possibly mislead the jury, and give them an erroneous impression of distance, resulting either from the manner in which it was taken, or from error in the evidence tending to show that the car and the crowbar constituted an exact reproduction of the condition existing at the time of the accident,—prone, as juries would naturally be, to accept any photograph as absolutely correct, not only as to the physical objects which it represents, but also as to the impressions which it conveys as to size and distance." We are clearly of the opinion that the trial court committed no reversible error in excluding the photographs offered by defendant.

We can see no reason why the judgment should be reversed on account of the alleged fact that there was no evidence that the cable was defective or that the accident was occasioned thereby. Nor do we think there was reversible error in refusing to instruct the jury, at the request of the defendant, that "some evidence has been introduced in connec-

tion with the cable used in the hoisting and lowering of the elevator here in controversy, and of its breaking and permitting the elevator to descend. I charge you, as a matter of law, that the breaking of the cable is in no way connected with the accident and resulting injury in this case, and that, in determining the question of whether the defendant was negligent, you must entirely disregard the strength or weakness of the cable, and no verdict can be based in favor of the plaintiff on the breaking of the cable."

How much of the injury, it is true, was occasioned by the breaking of the cable, is not clear; but it is clear that it did break, and it is also clear, that even if the accident in the first instance, that is to say, the falling on to the elevator, was not due to the negligence of the defendant, it was certainly the duty of the defendant to furnish a cable which would enable the elevator to be stopped when an accident happened, and which would not necessitate its falling to the ground. Even if the doctrine of *res ipsa loquitur* would not have applied if the cable had been forthcoming, we are of the opinion that it was made to apply by the failure of that production. Any other holding would simply mean that, in the case of the breaking of a cable or other appliance, all that the defendant has to do is to conceal the cable, and no relief can be obtained. Here we have a $\frac{5}{8}$ inch steel cable, that is 300 feet in length, and of a weight which must be very great. Strangely enough, this cable is lost, and though a demand is made for its production on both trials, and action was brought within three months of the accident, it is nowhere forthcoming. It is true that counsel for appellant states that he "has not the pleasure of living in Bismarck," and he, perhaps, could not have produced the cable. His client, however, should not be excused from producing this cable for that reason, nor for having lost or concealed it in the first instance. The accident happened in Bismarck, and the defendant lived in Bismarck, and a steel cable does not evaporate into the thin air in a few months or days.

Why, indeed, the breaking of the cable should not be held to be one of the operating causes, if not the proximate cause, of the injury, it is difficult for us to see; and it is clear to us that the plaintiff, Wyldes, could recover on this theory, if on no other, and that the instruction of the court was therefore not erroneous. Siegel, C. & Co. v. Treka,

2 L.R.A.(N.S.) 647, and note (218 Ill. 559, 109 Am. St. Rep. 302, 75 N. E. 1053, 19 Am. Neg. Rep. 166).

The testimony of the engineer, Orcott, is positive, that at the time the cable broke the elevator had only been lowered about 4½ feet, while one other witness gives even a lesser distance, and that he stopped the elevator at that point, and that the subsequent fall was due to the breaking of the cable. The testimony of the plaintiff shows that he was drawn on to the top of the elevator by the lowering of the elevator, he having his hands upon the handles of the wheelbarrow. It is true that much of the injury occasioned by the fall, therefore, must have occurred through the breaking of the cable. The engineer's testimony also tends to show that the sudden stopping of the elevator was not such as to have broken an ordinarily sufficient cable. He testifies:

Q. If you did not see the plaintiff at the time of the accident, how did you know that it broke at that particular time?

A. Well, all I know, he was on the elevator when it broke. Yes, sir, he was on the elevator—on the top of the elevator, yes, sir. Yes, sir, I saw him. It was before the accident—before it broke.

Q. What distance had the elevator been lowered before it broke?

A. The length of the elevator. The elevator from the platform was about four feet and a half. From the platform to the crosspiece where the cable hooked on. I stepped on my lever and stopped the elevator. He was on the top of the elevator, I stopped it as quick as I could.

Q. Would the stopping of the engine in the manner you did, and suddenly, cause a jerk upon the cable?

A. Not necessarily, I don't think.

Q. It was a sudden stop?

A. It probably was. I don't know, I am not sure. In stepping on my lever there is a clutch there, and I knew it would stop it as quickly as it could stop. I had started to lower the elevator down in the usual way. I had lowered it some 4 feet. Saw him make a break for the elevator, and, as he grabbed at the elevator, I stopped it. He grabbed the corner of the elevator like that, and swung around the cable. After I suddenly stopped the elevator, after I had lowered it some four feet and a half, or whatever distance it was, it was at that particular time that the cable broke. At that time Mr. Wyldes was on the

elevator, on the crosspiece at the top of the elevator. He was not on the platform, but on the crosspiece above it. When he was in that position I suddenly stopped the engine, and just as I made the sudden stop, the cable broke.

. We have, indeed, in The Luckenbach, 144 Fed. 980, a case which is very much in point on all of the questions involved, *viz;* the presumption that arises from the concealment of the cable, the duty to furnish a cable which will stand an ordinary strain such as the sudden stopping of the elevator, and the effect of the negligence of a fellow servant when coupled with a defective appliance. The court says: "The libellant sues to recover damages for the death of his intestate, who fell overboard and was drowned while engaged in arranging to cast anchor on the steamship Luckenbach, as she was coming into Hampton Roads, near the mouth of the Elizabeth river, preparatory to anchoring at Lamberts Point; the contention being that the accident occurred because of the defective condition of the 'trip' line attached to the block used in connection with the lowering of the anchor by the davit to the hawse pipe, as the block and tackle was being drawn back after lowering the anchor. The case turns upon the question of whether or not the respondent furnished to the libellant's intestate a sound, safe, and suitable rope with which to perform the work required of him. The evidence for the libellant is clear and strong, that the attention of the ship's representative had been called, prior to the accident, to the defective condition of the rope furnished, that gave way and caused the accident; and that it was unsuitable and unfit for the work. The respondent disputes the correctness of this position, and claims that the rope was new, and became unfastened, and that there was no defect in it. Upon the whole case, the conclusion reached is that whatever doubt there is on the question should be solved in favor of the libellant, *since the ship failed to produce the rope, which was in her possession,* that would have settled the question of its safe or unsafe condition, and whether it broke, or was ·new and inflexible and became untied, thus causing the accident. Respondent insists that, assuming that the rope may have parted as contended by libellant, nevertheless recovery should not be had, because the trip line was not intended to be used for hoisting purposes, and that the accident arose from the negligent manner

in which the fellow servant of the libellant's intestate performed the work, by improperly seizing hold of or catching the fish line which supported the block, thereby placing the strain and weight on the trip line, which was not intended to be used for such purpose. *The conclusion reached respecting this matter is that it was incumbent upon the ship to furnish such a rope as would provide against this contingency;* that is to say, taking into account the manner in which it had been usually handled, they ought to have anticipated that in raising the block and fish line, *the weight might be thrown upon this trip rope; and hence that the negligence of the fellow servant in bringing about this condition, if true, would not serve to relieve the ship from liability. The negligence of the fellow servant will not serve to relieve the master from liability, where the accident arises as the result of the negligence of such servant concurring with that of the master in failing to furnish proper appliances.* Grand Trunk R. Co. v. Cummings, 106 U. S. 700–702, 27 L. ed. 266, 267, 1 Sup. Ct. Rep. 493; 10 Rose's Notes, 438, 439. The Phœnix (D. C.) 34 Fed. 760; Clyde v. Richmond & D. R. Co. (C. C.) 59 Fed. 394; The Joseph B. Thomas, 46 L.R.A. 58, 30 C. C. A. 333, 56 U. S. App. 619, 86 Fed. 658, 664, 4 Am. Neg. Rep. 105; Richmond & D. R. Co. v. George, 88 Va. 223, 228, 13 S. E. 429; Norfolk & W. R. Co. v. Thomas, 90 Va. 209, 44 Am. St. Rep. 906, 17 S. E. 884; Norfolk & W. R. Co. v. Ampey, 93 Va. 108, 130, 25 S. E. 226."

Generally speaking, too, we may say that the law is well settled that, "if the negligence of the master or of one for whose conduct the master is answerable mingles with that of one who stands in the relation of that of a fellow servant to the servant receiving the injury; and if the negligence of the master or his representative is a proximate or efficient cause of the injury,—the master will be liable, and will not be allowed to escape liability on the ground that the injury also proceeded from the negligence of one for whose conduct he was not answerable. A different statement of the doctrine is to say that, in order to relieve the master from liability for an injury to one of his servants, the negligence of a fellow servant must have been the sole cause of the injury, and not commingled or combined with the negligence of the master or of his representative." Thomp. Neg. §§ 4856, 4863; Siegel, C. & Co. v. Trcka, 2 L.R.A.(N.S.) 647, and note (218 Ill. 559, 109 Am. St.

Rep. 302, 75 N. E. 1053, 19 Am. Neg. Rep. 166) ; Kern v. De Castro & D. Sugar Ref. Co. 24 N. Y. S. R. 748, 5 N. Y. Supp. 548 ; Shearm. & Redf. Neg. 5th ed. § 188 ; 2 Labatt, Mast. & S. § 184. See also note to Lutz v. Atlantic & P. R. Co. 16 L.R.A. 819.

Mr. Jones, in § 19 of his work on Evidence, says : "The mere withholding or failing to produce evidence, which under the circumstances would be expected to be produced and which is available, gives rise to a presumption against the party. It is a presumption less violent than that which attends the fabrication of testimony or the suppression of documents in which other parties have a legal interest; but the courts recognize and act upon the natural inference that the evidence is held back under such circumstances because it would be unfavorable. Said Lord Mansfield : 'It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted.' "

It is undisputed that the cable broke, while it was being used for the purpose for which it was intended, and at a time when there was no load on the elevator. The only evidence in the record regarding the cable and its fitness for the work in question is that of the defendant, who testified that he purchased a 300-foot ⅝ inch cable for the elevator hoist from the manufacturer in St. Paul, Minnesota; that the cable arrived in Bismarck about the 15th of August. Certain correspondence was offered in evidence by defendant, showing that the defendant, before purchasing the cable, made inquiries as to the price for which it could be obtained. On cross-examination, the defendant admitted that he obtained quotations of prices on the cable from different houses, and accepted the best terms, although he states that he can't remember whether he accepted the cheapest possible terms or not. The record also contains an invoice, showing that the price of the cable after deducting all discounts was $17.55. There is absolutely no testimony of any kind, aside from this, to show that the cable was of sufficient strength or fitted for the work for which it was used, nor is there any evidence of any kind showing that any inspection was ever made. Appellant's counsel seems to rely implicitly on the proposition that he has conclusively established the sufficiency of this cable by showing that a new cable was purchased about August 15th, even though

the accident did not occur until November 15th.  There is absolutely no
evidence of the condition of the cable on November 15th, or any time
after August 15th, and the testimony as to its condition on that date
is limited to the matters above specified.  The testimony shows that
the cable broke while it was being used for the purpose for which it was
intended, and at a time when there was no load on the elevator.  If the
approximate cause of plaintiff's fall in the first place was the failure
on the part of the defendant to establish a system of signals, still,
plaintiff's injuries would probably not have been very great if the cable
had not broken.  So, clearly, the breaking of the cable was directly a
contributory cause to the injuries sustained by the plaintiff.  The
testimony of the foreman, Larson, is to the effect that no signals had
been provided, and that he had ordered a discontinuance of all signals.
The testimony of the engineer is to the effect that he recognized a certain
system of signals.  The testimony of the engineer is also to the effect
that he had operated a hoisting engine only during a part of the last
two summers.  Does this testimony conclusively establish that the cable
was free from defects, and that the engineer was sufficiently skilled to
perform his labor, under the circumstances as disclosed by the evidence
in this case?

At the time of the trial, the plaintiff's counsel demanded that the
cable be produced.  Defendant's counsel stated in reply that he "did
not have the pleasure of living in Bismarck," and didn't know where it
was.  Clearly this was no sufficient explanation.

It is a well-settled rule of evidence, that the failure or refusal of a
party to produce evidence particularly within his knowledge and control,
and which would have an important bearing upon the facts in dispute,
warrants the inference that it would be unfavorable to his contention.
See Chamberlain on Evidence, § 1081a.  In this state, this rule has
been made a part of our statutory law.  Section 7936, Compiled Laws,
reads: "All other presumptions are satisfactory, if uncontradicted.
They are denominational disputable presumptions, *and may be contra-
dicted by other evidence.*  The following are of that kind:  . . .
5. That evidence wilfully suppressed would be adverse if produced.
6. That higher evidence would be adverse from inferior, being pro-
duced."  The very best evidence of the condition of the cable, and
whether or not it was defective, was the cable itself.  This was the

property of the defendant. This action was commenced on February 11, 1911, or within three months after the accident occurred. The complaint charged the defective cable as one of the grounds of negligence. The defendant knew he would be called upon to answer this charge, and both he and his attorneys must have known that the cable itself would be evidence of the very highest degree, yet under those circumstances the cable is not produced, even upon demand of the plaintiff. Defendant could have been permitted to go on the stand as a witness and explain the absence of the cable, but this was not done. The only explanation offered was the statement of counsel, not under oath, and hence of absolutely no evidentiary value. Under the laws of this state, the failure to produce the cable, until rebutted by competent evidence, was of itself evidence of the fact that the cable was defective, and that if produced it would show such defect. It also seems to us that, under the facts in this case, the occurrence of the injury, in the manner and under the circumstances shown to exist, is of itself sufficient evidence of the defect of the cable and the negligence of the defendant in using a defective cable. Or, in other words, that the doctrine of *res ipsa loquitur* applies. In Griffin v. Boston & A. R. Co. 148 Mass. 143, 1 L.R.A. 698, 12 Am. St. Rep. 526, 19 N. E. 166, the court reasoned as follows: "The separation of a train in consequence of the spreading of a link, where nothing further appears, is more naturally to be attributed to an imperfection or defect in the link than to any other cause. Ordinarily such separation would not happen if the link was sound, and suitable for use. If the link was not sound, and suitable for use, the fact of its being used in that condition properly calls for explanation from the defendant; and if, under such circumstances, the defendant fails to put in any evidence, some inference against it may be drawn therefrom. The fact may be susceptible of an explanation sufficient to exonerate the defendant. But, in the absence of such explanation, we think the jury might properly infer negligence on the part of the defendant. Primarily, in such case, one may properly look to the railroad company itself, whose duty it is to use reasonable care to provide safe instruments and means for operating the railroad. In the absence of any explanation by the company, it is more probable that the separation of the train was from a cause for which it would be responsible, than that it was from a cause for which

it would not be responsible." And in Houston v. Brush, 66 Vt. 331, 29 Atl. 380, it appeared that, although a derrick which gave way owing to the working out of a pin was almost daily subjected to the strain of lifting heavy stones, it had not been inspected to see if it was safe in this respect, for about thirty days prior to the accident. The court said: "The working out of the pin was an accident which, in the ordinary course of things, does not occur if those who have the care and management of a derrick use proper care. The case standing thus, we think the jury had a right to consider the fact that the pin came out as it did, and from it draw the inference that the defendant had failed to exercise ordinary care." In the same case, the court also said: "There was no evidence that either the plaintiff or the defendants had any apprehension that an accident like this might happen, or knew that the tin was off. The case standing thus, *the plaintiff clearly had the right to go to the jury on the questions whether the tackle block in the first instance was reasonably fit for the use to which it was to be put, and, if so, whether the defendants had properly inspected it, and kept it in reasonably good repair, so that the plaintiff's injuries were not the result of a shortage of legal duty on their part.* But the defendants insist that the negligence, if any, in respect to the block was the negligence of Bailey, who had charge of it, and that he was a fellow servant of the plaintiff, and consequently there can be no recovery by the plaintiff against them. The master is liable for the negligence of his servant while discharging a duty which the master owes to a general workman in his employ. If the tackle block was unsafe and unfit for use, in the respect complained of, when it came from the manufacturer and was put upon the derrick, or subsequently became so by reason of the failure of the defendants to properly inspect it and keep it in repair, they are liable, whether this condition resulted from their own negligence, or from the negligence of some servant to whom they delegated the performance of the duty which the law imposed upon them. Davis v. Central Vermont R. Co. 55 Vt. 84, 45 Am. Rep. 590; Deering, Neg. 198." In Sullivan v. Reed Foundry Co. 207 Mass. 280, 93 N. E. 576, ¶ 2 of the syllabus reads: "The unexplained fact that a hook broke while holding a weight much less than a sound hook of the same size should hold is evidence of the hook's defective condition." And in discussing this matter in the opinion, the court said:

"It is strenuously urged, however, that there was no evidence that the hook was weak. So far as respects the testimony of the experts and of those who had made a personal examination of the hook, it must be said that there is a very strong case made out for the defendant on this point. But, after all, there was some conflict in this part of the evidence, and it was for the jury to say what credit they would give to Miller, the expert called by the plaintiff. Moreover, one salient fact must not be lost sight of. *The hook broke while holding a weight much less than a hook of that size, if sound, should have held. That fact unexplained is of itself evidence of* a defective condition. Doherty v. Booth, 200 Mass. 522, 86 N. E. 945, and cases cited. . . . The question of the soundness or suitableness of the hook was properly left to the jury. The defendant further says that, even if the hook was defective, there is no evidence that the defendant was negligent in not ascertaining that fact. The hook had been used several months. In view of the evidence as to the material of which the hook was made, as to the length of time it had been used, and the kind of use, including its exposure to fire, as to the effect reasonably to be expected therefrom upon it by way of crystallization or otherwise, and as to the lack of inspection, the question of the negligence of the defendant was for the jury."

It will be noted that in the case of Sullivan v. Reed Foundry Co. supra, defendant offered evidence to show that the hook was not defective. In the instant case, no evidence was offered by defendant to prove that the cable in the first instance was of sufficient strength, or that any inspection thereof was ever made; the cable was not produced. It is a far stronger case for the application of the maxim of *res ipsa loquitur* than the case cited above. The maxim of *res ipsa loquitur* is founded in justice and reason. As was said by the supreme court of Vermont in Houston v. Brush, 66 Vt. 331, 29 Atl. 380: "Without attempting to formulate a rule embracing every case to which the maxim is to be applied, we think it is clear from the authorities cited, that when the defendant owes a duty to the plaintiff to use a certain degree of care in respect to the thing causing the accident, to prevent the occurrence of such accident, and the thing is shown to be under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not occur if those who have the management

use proper care, it affords evidence, in the absence of evidence show-
ing that it happened without the fault of the defendant, that the accident
arose from the lack of the requisite care. In such case the occurrence
itself, unexplained, shows prima facie a shortage of legal duty on the
part of the defendant. This doctrine does not dispense with the rule
that the party who alleges negligence must prove it; but, on the con-
trary, it only determines the mode of proving it, or what shall be prima
facie evidence of negligence in a certain class of cases. In the case at
bar the defendants owed the requisite duty to the plaintiff, to bring the
case within the rule. It is evident that the accident would not have oc-
curred if the pin had not worked out so as to cause the wheel to fall."
In the instant case, how could plaintiff prove affirmatively by extrinsic
evidence that the cable was defective or insufficient? The plaintiff was
not required to inspect the cable; and such inspection doubtless would
have been unavailing, as plaintiff was not presumed to be an expert in
matters of that kind—his duties were of a different character. The
cable was removed after it was broken, and not produced for the jury's
inspection. It is obvious that plaintiff would be absolutely unable to
prove any defect, except such as would be inferred from the happening
of the accident itself. The defendant was in position to prove the fitness
of the cable for its intended use, the inspection thereof from time to
time, and its freedom from defect at the time of the accident, if such
were the case. These were matters peculiarly within his knowledge, and
upon which he could have furnished proof if he desired. The maxim of
*res ipsa loquitur* sprang into existence by reason of the vast increase in
modern times of the use of powerful machinery, harmless in normal
operation, but capable of serious human injury if not constructed or
managed in a certain mode. Wigmore, Ev. § 2509. And it was in-
tended to apply to cases such as the one at bar. It is self-evident that if
the cable on November 15th had been of sufficient strength and free
from defect, it could not and would not have broken. That the break-
ing of the cable under these circumstances was of itself sufficient to
raise a presumption of negligence is sustained by the overwhelming
weight of authority. See also Jones on Evidence, § 19.

It has been held that the maxim of *res ipsa loquitur* applied, and that
the jury would be justified in finding the defendant negligent and the
plaintiff entitled to recovery, in the following cases:

Where a hook used to lift a smokestack straightened from the mere weight of the smokestack. El Paso Foundry & Mach. Co. v. De Guereque, 46 Tex. Civ. App. 86, 101 S. W. 814. Where a chain which was part of an elevator wholly under the control of the master fell. Konigsberg v. Davis, 57 Misc. 630, 108 N. Y. Supp. 595. Where an elevator fell. Fearington v. Blackwell Durham Tobacco Co. 141 N. C. 80, 53 S. E. 662. Where a safety clutch on an elevator failed to work. National Biscuit Co. v. Wilson, — Ind. App. —, 80 N. E. 33. Where an elevator in charge of defendant's engineer fell without fault on the part of the plaintiff, who was operating it. Dahlen v. New York L. Ins. Co. 109 Minn. 337, 123 N. W. 926. Where a belt creeps automatically from one pulley to another. Petrarca v. Quidnick Mfg. Co. 27 R. I. 265, 61 Atl. 648. Where a rope used to handle heavy timbers broke. Jefferys v. Nebraska Bridge Supply & Lumber Co. 157 Fed. 932.

Where a scaffold furnished by the master fell while being used in the manner intended. Cleary v. General Contracting Co. 53 Wash. 254, 101 Pac. 188.

Where a piece of timber fell during the construction of a building. Kain v. Roebling Constr. Co. 72 Misc. 34, 129 N. Y. Supp. 151.

Where a buffer iron fell off the bolt on which it was hung, because the split key holding it in place fell out. Sullivan v. Rowe, 194 Mass. 500, 80 N. E. 459.

Where a crowbar fell from upper story of a building where servants were at work, and fell upon the plaintiff, who was working below. Johnson v. Metropolitan Street R. Co. 104 Mo. App. 588, 78 S. W. 275.

Where a servant at her place of work is injured by the fall of a barrel from a platform above her. Armour v. Golkowska, 202 Ill. 144, 66 N. E. 1037, 14 Am. Neg. Rep. 13.

Where a brick falls from a portion of a building where only bricklayers employed by defendant are at work, and injures the plaintiff. Guldseth v. Carlin, 19 App. Div. 588, 46 N. Y. Supp. 357.

Where a brake chain broke, throwing a brakeman to the ground. Galveston, H. & S. A. R. Co. v. Harris, 48 Tex. Civ. App. 434, 107 S. W. 108.

Where a piece of timber, which has been left leaning against a post, falls. Sackewitz v. American Biscuit Mfg. Co. 78 Mo. App. 144.

Where a dumb-waiter, while unloaded, falls from the fifth floor of a warehouse and injures an employee, who has inclined his head within the shaft to hear orders given from another floor, as was customary. Winkelmann & B. Drug Co. v. Colladay, 88 Md. 78, 40 Atl. 1078, 4 Am. Neg. Rep. 645.

Where the place which a miner was required to pass over gave way in a sudden and unexplained way. Lentino v. Port Henry Iron Ore Co. 71 App. Div. 466, 75 N. Y. Supp. 755.

Where a rock fell from the roof of a tunnel into which the servant had been ordered to take the train. Louisville & N. R. Co. v. Cason, — Ky. —, 116 S. W. 716.

Where a bucket in which the plaintiff was being hoisted from a mine fell down the shaft because the cable ran off the drum. Texas & P. Coal Co. v. Daves, 41 Tex. Civ. App. 289, 92 S. W. 275.

Where an open window in the office of a railroad company falls on one who was presenting an order for payment, in accordance with a custom of the company to pay its employees through such window. Carroll v. Chicago, B. & N. R. Co. 99 Wis. 399, 67 Am. St. Rep. 872, 75 N. W. 176.

Where plaintiff, who was walking along a pathway outside of the railroad company's right of way, was struck by cross-ties, as they fell from a moving train. Howser v. Cumberland & P. R. Co. 80 Md. 146, 27 L.R.A. 154, 45 Am. St. Rep. 332, 30 Atl. 906.

Where an iron ear, which connected the trolley with a guy, broke, and fell on plaintiff's head. Uggla v. West End Street R. Co. 160 Mass. 351, 39 Am. St. Rep. 481, 35 N. E. 1126.

It should also be remembered that at the time the cable broke, it was being used for the purpose for which it was intended, and was not being subjected to any unusual strain. Under such circumstances the maxim of *res ipsa loquitur* is especially applicable. Hannan v. American Steel & Wire Co. 193 Mass. 127, 78 N. E. 749; Folk v. Schaeffer, 186 Pa. 253, 40 Atl. 401; Cleary v. General Contracting Co. 53 Wash. 254, 101 Pac. 888; Stewart v. Ferguson, 164 N. Y. 553, 58 N. E. 662, 9 Am. Neg. Rep. 132.

Generally speaking, and in connection with this and the other portions of the instructions which are complained of, we may add that the law of the case has been established by our former opinion in Wyldes v.

Patterson, 24 N. D. 218, 139 N. W. 577. We are still of the opinion that it was there correctly stated. That decision, at any rate, is controlling upon us here. See Hayne's New Trial & Appeal, vol. 2, page 1658 and cases cited. So, too, the instructions with which we are concerned are those to which exceptions were taken—all the other portions of the instructions will be regarded as the law of the case. 2 Cyc. 724; see also Appeal & Error, 1 Decen. Dig, § 263. (1) The trial court in its instructions outlined the issues as formed by the pleadings. This was the proper method of outlining the issues. Sackett, Instructions, § 155. The defendant did not ask the court to eliminate any question raised by the pleadings from the jury's consideration, with the single exception of the strength or weakness of the cable. A party should not be heard to complain that an issue raised by the pleadings is improperly submitted to the jury, where no request is made for an instruction to take same away from the jury's consideration. 2 Cyc. 701. Nor did the defendant except to that portion of the instructions outlining the issues; hence the correctness thereof is not before this court for determination, but they are the law of the case. The only instructions to which exceptions were taken are the following:

(a) "You will take into consideration all of the evidence bearing upon the question of negligence, and in the light of it all determine whether the defendant was in fact negligent as *charged,* and whether the plaintiff was in fact negligent in such a manner as to contribute to the injury."

(b) "The plaintiff must so establish the fact of the alleged injury, that such alleged injury was caused by and through the negligence of the defendant in some of the manners charged in the complaint."

(c) "I charge you, gentlemen of the jury, that it was the direct, personal, and absolute obligation of the defendant in this case to provide reasonably safe and suitable machinery and appliances for the business then in hand. This includes the exercise of reasonable care in furnishing such appliances. An employer must furnish a safe place in which his employee is to work."

(d) "I charge you that the plaintiff herein by his contract of employment with the defendant did not assume the risks arising from the want of sufficient and skilled labor, or from defective machinery, or other instruments with which he had to work."

(e) "I charge you that it was the duty of the defendant in this case to furnish the plaintiff with safe and suitable appliances with which to perform the work required of him, and also to see that the same were kept in proper repair, and if this duty was negligently performed and the plaintiff sustained any injury thereby, the defendant was responsible in damages."

The first instruction excepted to (a) is merely a portion of the instruction relative to the law of negligence. The entire instruction is as follows: "In determining the question of negligence, both on the part of the plaintiff and the defendant, you should consider all the circumstances under which the defendant caused the acts to be performed alleged in the complaint, and under which he failed to act, if you find that he did fail in such respect. You have a right to take into consideration the conditions surrounding the injury,—the situation of the parties, the character and location of the machinery and appliances and the building under construction, and their location with respect to each other, the fact that the employment of the plaintiff was or was not a dangerous one, the fact that the plaintiff was or was not aware of the nature of such employment, the fact of whether or not it was necessary that a code of signals be promulgated and enforced in order to insure the reasonably safe carrying out of the operations then in hand,—in fact, all of the facts and circumstances and conditions existing at the time of the alleged accident. You will take into consideration all of the evidence bearing upon the question of negligence, and, in the light of it all, determine whether the defendant was in fact negligent as charged, and whether the plaintiff was in fact negligent in such manner as to contribute to the injury." Will anyone seriously contend that this instruction, taken as a whole, is erroneous? It seems to us that such contention would be untenable.

In the case of the second instruction (b) also, appellant has selected a part of an instruction—in fact, a mere clause out of a sentence. It seems to us that there might be a question if such exception presents anything for this court to review. The entire instruction is as follows: "Furthermore, gentlemen of the jury, I charge you that the plaintiff in this case having set up those facts which he relies upon as giving him the right to recover here, the burden is upon him to establish to your satisfaction by a fair preponderance of the evidence—

that is, by a greater weight of evidence—the existence and truth of those facts, and if the plaintiff fails to so establish those facts, then, and in that case, your verdict here must be for the defendant; that is, the plaintiff must so establish the fact of the alleged injury, that such alleged injury was caused by and through the negligence of the defendant in some of the manners charged in the complaint, and the amount of the damage that the plaintiff suffered by reason of such injury. And if he fails to establish any or all of those facts, then he has failed to make out his case, and you must find against him." It will be observed this instruction relates to the burden of proof, and it is not contended that the law thus charged is erroneous. The only possible complaint relates to the reference made to the issues in the case. As already stated, no exception is taken to that part of the charge outlining the issues; hence the same will be regarded as the law of the case, and is not subject to review. The instruction was limited to the burden of proof, and clearly impressed upon the jury the fact that the plaintiff must prove his case before he could recover. This of itself was equivalent to an instruction to disregard allegations of negligence not proven, and this is especially so when taken in connection with the portion of the charge immediately following; which was as follows: "I charge you, as a matter of law, that you cannot infer that the defendant was negligent merely because of the happening of the accident. The plaintiff must prove by a fair preponderance of the evidence that the accident was caused by some default or neglect on the part of the defendant, irrespective of, and independent of, the happening of the accident."

In case of the third instruction (c) also, appellant merely selects a part of an instruction. The complete instruction was as follows: "I charge you, gentlemen of the jury, that it was the direct personal and absolute obligation of the defendant in this case to provide reasonably safe and suitable machinery and appliances for the business then in hand. This includes the exercise of reasonable care in furnishing such appliance. An employer must furnish a safe place in which his employee is to work. *But the defendant was not an insurer of the plaintiff's safety, nor of any of the appliances which the plaintiff was required to use, nor was he an insurer of the methods of the doing of the work, in which the plaintiff was engaged at the time of the accident,*

31 N. D.—21.

*but the defendant was only required to exercise ordinary care; that is, such care as a man of ordinary prudence would exercise in the like or similar circumstances.* The plaintiff assumed the risks naturally and ordinarily incident to the work in which he was engaged at the time of the accident and in the course of his employment." This is a correct statement of the law. As was said by this court in Cameron v. Great Northern R. Co. 8 N. D. 124, 130, 77 N. W. 1016, 5 Am. Neg. Rep. 454: "It is well settled that the master must furnish the servant with reasonably safe and suitable machinery and appliances, and if the master fails in this duty, and the servant is injured thereby while in the exercise of due care, the master will be liable for such injury. The master is bound to observe all the care which prudence and the exigency of the situation requires, with respect to furnishing instrumentalities adequately safe for the use of the servant, and when such instrumentalities are furnished, the master is required, further, *to exercise due care in keeping the same safe and serviceable;* and, with this end in view, the master is bound to make seasonable inspection of the condition of the instrumentalities furnished for the use of the servant. These rules are familiar, and are so frequently reiterated by the courts that authority in their support is unnecessary." See also Sackett on Instructions, §§ 1495, 1496.

The fourth instruction excepted to (d) is not even a complete sentence, but merely a qualifying clause qualifying the remainder of the sentence. The complete instruction is as follows: "Furthermore, I charge you, that he likewise assumed such risks connected with the method of doing the work in the manner in which it was being done, at the time he was injured, as he knew and appreciated, or in the exercise of ordinary care should have known and appreciated. The plaintiff was required to use reasonable care for his own safety. The law will not permit him to say he did not see that which was obvious, and that he did not know or appreciate things which should be known and appreciated by persons of ordinary intelligence. The plaintiff cannot be permitted to shut his eyes and say he did not see, nor to close his ears and say he did not hear; but I charge you that the plaintiff herein by his contract of employment with the defendant did not assume the risks arising from the want of sufficient and skilled labor, or from defective machinery or other instruments with which he had to work."

It must be observed that this is a negative instruction, and is limited expressly to the question of the assumption of risk. It is conceded that it is a correct statement of the law as an abstract proposition. Appellant's attack on this instruction is predicated on the erroneous assumption that this instruction authorizes the jury to return a verdict against the defendant on a ground of negligence not involved. This argument is wholly fallacious, and worthy of little consideration. The court had already carefully instructed on the questions of negligence, and contributory negligence, and assumption of risk. The instruction challenged related solely to the assumption of risk. It must be presumed that the jury applied it in accordance with the directions of the court, and to the subject to which its application was limited, and, this being so, it seems clear that defendant was not prejudiced by it. The argument that jurors will take isolated phrases of a charge and apply the same to matters wholly foreign to the subject to which they relate is not one which appeals to reason. The jurors are presumed to be men of ordinary intelligence, and to have acted as such. It is obvious that if qualifying clauses are read by themselves, they will convey a meaning radically different from that intended to be conveyed, and actually conveyed by the sentence as a whole. If the same method employed by appellant's counsel in this case be adopted in construing the state Constitution, some rather startling results will be obtained. Thus, the first clause of § 8 of the Constitution reads: "Until otherwise provided by law, no persons shall, for a felony, be proceeded against criminally." And the first clause of § 64 reads: "No bill shall be revised or amended," and the first clause of § 73 reads: "No person shall be eligible to the office of governor or lieutenant governor." Of course, the clauses so selected are no indication of the meaning conveyed by the respective sections from which they are quoted, but it demonstrates the unfairness of appellant's counsel in the exceptions taken to the charge to the jury in this case. He has adopted the method utilized by the atheist who invoked the aid of the Bible in proving that there was no God. He quoted the clause, "There is no God," from the 14th Psalm, when the complete sentence reads: "The fool hath said in his heart, *there is no God.*" So in this case appellant's counsel has selected, not complete instructions, nor even complete sentences, but isolated clauses. The unfairness of this seems to us to be entirely obvious.

The burden of establishing the defenses, not only of contributory negligence, but also of assumption of risk, was upon the defendant. Shebeck v. National Cracker Co. 120 Iowa, 414, 94 N. W. 930, 931; Nicholaus v. Chicago, R. I. & P. R. Co. 90 Iowa, 85, 57 N. W. 694; Thompson v. Great Northern R. Co. 70 Minn. 219, 72 N. W. 962; Nadau v. White River Lumber Co. 76 Wis. 120, 20 Am. St. Rep. 29, 43 N. W. 1135.

The fifth instruction challenged here (e), also, is only a part of a sentence, the complete instruction being as follows: "I further charge you that it was the duty of the defendant in this case to furnish the plaintiff with safe and suitable appliance with which to perform the work required of him, and also to see that the same were kept in proper repair, and if this duty was negligently performed and the plaintiff sustained any injury thereby, the defendant was responsible in damages; provided that such negligence of the defendant was the direct and proximate cause of the injury, and that the plaintiff did not contribute to the direct and proximate cause of the injury by his own negligence." The error urged with reference to this instruction—and this applies in part to the instruction considered under point (c) above —all goes to the question of the defect in the cable, and is fully covered by what we have said under point (d) above and in our previous discussion.

The trial court clearly was justified in refusing to instruct the jury to disregard all testimony relative to the breaking of the cable. This point has already been fully discussed. In our opinion, the defendant received far more favorable instructions from the court upon this feature of the case than he was entitled to receive. The court, among others, gave the following instruction: "I charge you, as a matter of law, that you cannot infer that the defendant was negligent, merely because of the happening of the accident. The plaintiff must prove by a fair preponderance of the evidence that the accident was caused by some fault or neglect on the part of the defendant, irrespective of, and independent of, the happening of the accident." We believe that the court would have been justified in instructing the jury that, under the evidence in the case, the breaking of the cable in the manner and under the conditions which it did raised a presumption that such cable was defective, and that the burden was upon the defendant to rebut such

presumption. See Uggla v. West End Street R. Co. 160 Mass. 351, 39 Am. St. Rep. 481, 35 N. E. 1126.

The court's instructions should be taken as a whole, and when this is done, we are unable to see where appellant has any cause to complain. "The charge is entitled to a reasonable interpretation. It is construed as a whole, in the same connected way in which it was given, upon the presumption that the jury did not overlook any portion, but gave due weight to it as a whole; and this is so, although it consists of clauses originating with different counsel and applicable to different phases of the evidence. If, when so construed, it presents the law fairly and correctly to the jury, in a manner not calculated to mislead them, it will afford no ground for reversing the judgment, although some of its expressions, if standing alone, might be regarded as erroneous; or because they may be an apparent conflict between isolated sentences; or because its parts may be in some respects slightly repugnant to each other, or because some one of them, taken abstractly, may have been erroneous. If, therefore, a single instruction is found which states the law incorrectly, and yet it is qualified by others in such a manner that the jury were probably not misled by it, it will not be ground for reversing the judgment." Thomp. Trials, § 2407. See also Gagnier v. Fargo, 12 N. D. 219, 96 N. W. 841.

But even though it be conceded that the instructions are in part erroneous (which we by no means do), this would not of itself justify a reversal. "Courts of error do not sit to decide moot questions, but to redress real grievances. It is, therefore, a rule of nearly all the courts, that no judgment will be reversed on account of the giving of erroneous instructions, unless it appear probable that the jury were misled by them. Expressions of this rule could be multiplied almost without limit. Thus, it is said that instructions faulty, or technically erroneous, will not work a reversal of the judgment, if the jury were not misled, or if, as a whole, the case was fairly presented to them, and especially if their verdict is obviously correct. So, although an instruction given to the jury contained matter technically erroneous, yet if the objectionable part was merely superfluous, and not calculated to mislead, the judgment will not be reversed because of the giving of it." Thomp. Trials, § 2401.

"There is a marked distinction between submitting to the jury an

instruction based upon a hypothetical state of facts which there is no evidence tending to prove, and what is termed an abstract instruction. As a general rule, the former will be error, and the latter not. By the giving of an abstract instruction is understood the statement of an abstract proposition of law, which is irrelevant to the issues on trial. *The general rule, perhaps, is that* this is not ground of reversal in a civil case, even where the *proposition of law may be erroneously stated, since it would not be likely to influence the jury either way.* 'Every charge of a court,' said Willie, Ch. J., 'must be tested by the facts to which it is applicable.' The announcement, therefore, of a general principle in a charge which in the abstract may be wrong, will not be cause for reversing the judgment, if it be so modified by the charge, in view of the facts of the case, that it could not affect the rights of the party complaining." Thomp. Trials, § 2321.

"Of course, it can never be said that the jury were misled by the giving of erroneous instructions, where they have reached the correct result by their verdict. Accordingly, it is the practice of most of the courts, before passing upon exceptions to instructions, to look into the evidence and see if the verdict was right; and if it is found to be so, the court will look no further. The rule of these courts is, that a good verdict cures all errors in the intermediate steps by which it was reached. In England, it is no ground for a new trial that the judge misdirected the jury, unless it is shown that the jury were thereby induced to form a wrong conclusion. If the revising court sees that justice has been done between the parties, they will not set aside the verdict, nor enter into a discussion of the questions of law." Thomp. Trials, § 2402. "We waste time in multiplying forms of expression, beyond saying that the courts which entertain this conception refuse to reverse judgments because of errors in giving or refusing instructions, where they can see from the whole record that substantial justice has been done, and that another trial ought to produce the same result." Thomp. Trials, § 2403.

The small amount of the damages found by the jury shows that it was not actuated by passion or prejudice. In our opinion, the verdict is just and right; and the judgment based thereon should be affirmed. It is so ordered.

Fisk, Ch. J., dissenting. With all due deference to the judgment of my associates who join in the majority opinion herein, I most respectfully dissent from the conclusion reached, as well as from much that is announced therein. The majority opinion impresses the writer as a strained and wholly unwarranted effort to uphold plaintiff's recovery, regardless of prejudicial errors in the record. This may seem to be a rather strong statement; but I shall attempt, as briefly as possible, to substantiate my assertion. To start with, I take it for granted that every person is entitled to a fair trial, which means a trial free from prejudicial error (Hintz v. Wagner, 25 N. D. 110, 140 N. W. 729), and, as I construe this record, such a trial, with all due respect to the learned trial judge, was not accorded the defendant. I recognize the rule, as stated in the majority opinion, that a reversal will not be ordered for errors committed on the trial, where it clearly appears that the verdict is right, and in all likelihood no other result would be attained on another trial. This is but another way of stating that the errors were nonprejudicial. I fail to see how this rule can be invoked in the case at bar, for it must be conceded that at least the great weight of the testimony is against the plaintiff's contentions. If it can properly be said that the verdict is clearly right in this case, the same may likewise be said of every verdict, regardless of the testimony.

It would serve no useful purpose in this dissent to refer to all the pronouncements in the majority opinion which I deem indefensible, and I shall content myself by merely referring to a few.

It is stated in the majority opinion that "it is also clear that, even if the accident in the first instance, that is to say, the falling on to the elevator, was not due to the negligence of the defendant, it was certainly the duty of the defendant to furnish a cable which would enable the elevator to be stopped when an accident happened, and which would not necessitate its falling to the ground." This impresses me as a novel doctrine. The logical and inevitable result of such a rule is to make the master liable for the servant's injuries, even though occasioned either by mere accident or by his own carelessness. Must the master anticipate that the servant may be careless, and therefore furnish instrumentalities, not only sufficient for the uses intended, but also of sufficient strength to insure the servant against resulting injury occasioned by his

own carelessness? I cannot lend my assent to such an unheard-of doctrine.

Again, the majority say: "Why, indeed, the breaking of the cable should not be held to be one of the operating causes, if not the proximate cause, of the injury, it is difficult for us to see; and it is clear to us that the plaintiff, Wyldes, could recover on this theory, if on no other." While this seems to be clear to the majority of this court, it was evidently not so clear to plaintiff's able counsel, for at the argument they expressly disclaimed liability on such ground. Moreover, in their printed brief respondent's counsel say: "It was alleged in the complaint that the cable was weak and defective; but this was abandoned on the trial, and no proof introduced by plaintiff to substantiate this allegation of the complaint." Notwithstanding this, the majority opinion devotes much space in an effort to demonstrate that plaintiff's recovery may be sustained upon such ground of negligence. But it is a significant fact that this court, even on the former appeal, asserted no such ground of liability. On the contrary, the court there carefully refrained from so doing. In the light of the above, I ask how can it be properly said that the doctrine of *res ipsa loquitur* has any application? Why should defendant produce the cable at the trial, in the light of this express abandonment by plaintiff of such ground of negligence? Clearly, the *cause* of the accident cannot be attributed to the breaking of the cable, but, at the most, such breaking merely enhanced plaintiff's injury. Hence, in determining the question of primary liability in this case, the breaking of the cable should be ignored. The Illinois case cited in the majority opinion is not in point, and is easily differentiated from the case at bar, as are the other cases cited.

In addition to the above, I merely desire to say that the fact that such cable parted when subjected to the unusual strain disclosed by the evidence is no proof whatever that defendant was guilty of a want of due care in using the same. The majority opinion states that "it is undisputed that the cable broke while it was being used for the purpose for which it was intended, and at a time when there was no load on the elevator." As I read the record, such statement is unwarranted, and clearly contrary to the conceded facts. The purpose of the elevator was to raise building material to the various landings— not to afford a lighting place for those who might fall on to it.

Again, there is neither allegation nor claim that the engineer was not sufficiently skilled in his line of duty; yet the majority sustain an instruction telling the jury, in effect, that liability may be predicated on the ground of the lack of proper skill. As I shall hereafter point out, other equally erroneous and prejudicial instructions were given and upheld by the majority opinion. Before noticing them, I will advert to the issues as framed by the pleadings, and the proof offered in support thereof. The complaint alleges:

"1. That the elevator and scaffold used in the construction of the building *were improperly constructed and unfit for the purposes for which they were used.*

"2. That the cable and fastenings used to operate the elevator were weak and defective, and not of the proper strength and weight for the purpose for which they were used.

"3. That no *appliance* was used or supplied to prevent the cage of the elevator from falling in case of the parting of the cable, or the happening of any other contingency by which the cage might become loose or disconnected from its fastenings.

"4. That the elevator cable and fastenings were not properly *inspected, repaired,* or *replaced,* but were allowed to become *worn, weak,* and *defective,* and out of repair.

"5. That the steam engine used to operate the elevator was *so inclosed that the engineer or person operating the same could not see the landings where the elevator stopped.*

"6. That no electrical or other proper signal system was furnished or provided for the elevator."

It is further alleged that while the plaintiff was upon one of the landings of the elevator, which landing was not visible to the engineer operating the engine, the elevator cage was suddenly and without warning lowered from the front of the landing, and that he was at that time about to push a wheelbarrow on to the elevator, without negligence on his part; and that he was drawn forward on to the elevator with great force and violence. That when he was so drawn or thrown upon the elevator, the tacklings and fastenings gave way, and the elevator fell to the ground. That, solely by reason of the defendant's negligence, as alleged, he sustained the injury of which he complains.

The answer denies any negligence on defendant's part, and alleges

that the plaintiff's injury was caused by his own negligence or by the negligence of his coemployee, and that he assumed the risk.

*At the last trial there was no evidence to sustain any of the grounds enumerated in ¶¶ 1–5 inclusive, above quoted, nor does respondent urge on this appeal that there is any evidence tending to support the verdict upon any of such grounds;* but in lieu of the alleged negligence set forth in ¶ 5, respondent was permitted to offer testimony tending to show that the building in which the engineer who operated the elevator was stationed was in such close proximity to the hotel building as to preclude such engineer from having a clear vision of the landing at the roof of the building, so as to enable him to see the plaintiff while in the discharge of his duties in placing wheelbarrows upon the removing them from such elevator. In other words, as I understand respondent's contention on this appeal, he seeks to justify the verdict and judgment, upon the sole ground that it was culpable negligence on defendant's part not to have provided a system of signals for the information and guidance of the engineer in operating such elevator, and that such negligence was the proximate cause of plaintiff's injury. Such contention is of necessity predicated upon the assumption that without a code of signals for such purpose, it was impossible for the engineer to operate such elevator with a reasonable degree of safety to the plaintiff, by reason of the alleged fact that the engineer was so located and situated in the discharge of his duties as to be unable to have a reasonably clear vision of the plaintiff at the time of the accident causing his injury. There is much force in the statement by appellant's counsel, that obviously the complaint was framed on the theory that a signal system was necessary because the engine house was so *inclosed* that the engineer could not see the *landings,* and that the evidence wholly fails to substantiate such theory. Indeed, it is not contended by plaintiff that such signal system was necessary by reason of any alleged faulty construction of the engine house precluding the engineer from having a clear vision of the elevator and its landings; but his contention was, and is, that such signal system was rendered necessary by reason of the location of the engine house so near the building line as to preclude the engineer from having a clear vision of such landings after the cornice was built. There is also much merit in appellant's contention that this latter ground is not alleged in the complaint; but counsel do not seri-

ously urge such variance on this appeal, evidently because of our holding on the prior appeal, to the effect that liability may, if the evidence warrants it, be predicated upon such new theory of negligence. This question is no doubt foreclosed by such prior decision.

It is most strenuously insisted by appellant's counsel, however, that under the state of the evidence on this appeal there is no room for intelligent men to fairly differ in their conclusions upon any of the essential facts; that the evidence and the physical facts disclosed by this record demonstrate, to a moral certainty, that the engineer could see the landing and the plaintiff upon the roof at the time of the accident. Hence they contend, that it was error to submit to the jury the question as to defendant's negligence in failing to install a system of signals. It is, of course, true that if the engineer, from the place where he was located, could plainly see the elevator and the movements of the men about the elevator landings, there was no duty on defendant's part to provide a signal system, for reasons too obvious to mention. Under such conditions, all concerned in the movements of such elevator would have been furnished all the protection that could be afforded by such signal system.

In support of their contention that the engineer had a clear vision of the plaintiff at and just prior to the time of the accident, appellant's counsel have made an elaborate review of the testimony in their printed brief, and they have attempted to point out and emphasize the fact, that a material distinction exists between the testimony at the last trial and that at the former hearing. Among other things, they call attention to the fact that on the last trial the location of the engine house was not left to mere recollection, estimate, or guess, as at the first hearing; but it was shown, without contradiction and with conclusive certainty, that its west wall was from 19 to 21 feet east of the hotel building, which would bring the engineer, who was in the northeast corner of such engine house, about 33 feet east of the east line of the hotel building. This conclusion is based upon the undisputed testimony that a 16-foot cement sidewalk was laid between the hotel and the engine house before the latter was removed, and that a space of from 3 to 5 feet must have existed between the curb of such walk and the west line of the engine house; also, that the engine house was 14 feet in width. Attention is also directed to the fact that the landing where the accident occurred

was scant 3 feet in width, and projected over the outer edge of the cornice from 6 to 8 inches, so that when the elevator stopped its platform connected closely on a level with the projecting end of such landing; also, that the engine house was located about 60 feet south of the elevator; that such elevator or hoist consisted merely of an open platform, held by a beam on each end running upward to a height of 8 or 9 feet, where a crossbeam was fastened parallel with the platform, and such elevator was suspended and operated by tackle and cable attached to such crossbeam, which cable passed over wheels and pulleys set in the woodwork at the top of the tower, some 10 feet higher than the roof of the building, and which tower was a temporary structure built of 2x4 and 4x4 timbers. The height of the hotel building was given at the last trial as 79 feet, 5 inches; but to arrive at the height from the top of the cornice, there must be deducted 1 foot, $2\frac{1}{2}$ inches for the scroll work, which the evidence shows was placed on the cornice after the accident, leaving the height 78 feet, $2\frac{1}{2}$ inches. Such scroll work would, of course, be a material obstruction to the vision, at the time the observations were made and the photographic views taken during the last trial.

Upon the crucial question as to whether the engineer had a clear view at the time of the accident, I submit that the following résumé of the evidence at the last trial is correct. Defendant Patterson testified that there never was a time during the construction that a man could not be seen on the roof; that, after the cornice was put on the building, he was in the engine house very often, and had occasion to look; that a man could be plainly seen on the gangway or runway, approaching and placing a wheelbarrow upon the elevator.

Clarence Orcott, the engineer, testified that he was 5 feet, 10 inches tall. That at all times he could plainly see the men about the elevator, pushing off and on wheelbarrows. That the tower and cornice presented no obstructions to his view. That he experienced no difficulty in seeing the men place wheelbarrows on the elevator and then standing back on the runway.

Fred Swanson, a carpenter, who had worked all over the building, testified that the engineer could plainly see the men and the wheelbarrows. That he could plainly see the engineer while he was standing on the gangway or runway. That he stood on the runway and signaled the engineer; that he could see him; that after the cornice went on he

had occasion to stand on the runway; he could see the engineer. That he signaled the engineer, who responded to his signal. This witness was 5 feet, 8½ inches tall.

August Watts, a brick mason, who had worked on the building from top to bottom, testified that, after the cornice was put on, standing on the runway, he could see the engine house, the windows in front and on the roof, and the engineer himself.

Ben Goldader testified that he had worked on the building from the beginning; had worked on the roof after the cornice was put on. That, standing on the runway, he had motioned to the engineer with his hands, in plain sight, and that there was no difficulty in seeing the engineer.

John L. Larson, a witness on the part of the plaintiff, who at the time of the accident was the foreman in charge of construction, testified that at all times, and after the cornice was placed on the building, the engineer had a clear view of the operation—if the barrows were filled they would be turned one way, and if empty turned the other way, so that there could be no question about whether the elevator was to go up or down—and that for that reason signals were entirely unnecessary. That he knew the view was clear, of his own knowledge, by actual experiment. That he had operated the engine himself many times, after the cornice was put on.

M. J. O'Connor, a witness for the plaintiff, testified that, standing beside the engineer on the outside of the engine house, he could see the wheelbarrows come out from the roof and the elevator come down; that he could see the men waiting for the wheelbarrow to come up. He said he could see the wheelbarrow approach the elevator, but not the man behind it.

In addition to the above, a large mass of testimony was introduced from the lips of various witnesses, who were present at the scene of the accident, and who participated in making demonstrations during the last trial, to determine whether the engineer had a clear view of the roof landing after the cornice was built. I shall not attempt to reproduce such testimony at length. Suffice it to say, that it strongly tends to corroborate defendant's contention upon the issue as to whether the engineer had a clear vision of the landing at the time of such accident. I have no hesitation in concluding from the record as now presented,

when considered in the light of the known physical facts, that there is no such substantial conflict in the evidence as to warrant submitting to the jury the question of defendant's negligence in not providing a system of signals, as none were required. The evidence on the last trial bearing on this question differs so materially from that presented on the former appeal as to clearly differentiate the two records; and therefore the principles of law formerly announced are inapplicable, and not binding upon us under the rule of the law of the case. When we take into consideration the fact, as shown by the undisputed testimony given at the last trial, that when the loaded wheelbarrow was elevated to the landing the wheel faced towards the man on the runway, and to reach the handles he was required to step over the wheelbarrow into the elevator; and that when he returned the empty wheelbarrow from the roof to the elevator he was required to pass over such landing or runway, in order to place the wheelbarrow in the elevator with the handles thereof on blocks provided for that purpose; and when we consider the further undisputed fact that such landing projected from 6 to 8 inches over the outer edge of the cornice in order to bring the landing flush with the elevator platform, I am unable to see, under any possible construction of the evidence, how it can be legitimately claimed that this work was not in plain view of the engineer. It is nowhere contended that the elevator itself, or the tower thereof, presented any material obstruction to the view, for both the plaintiff and his witness, O'Connor, testified that before the cornice was built the man on the landing was in view of the engineer. It is wholly inconceivable that the engineer could successfully operate the elevator, as he did for weeks after the cornice was built, if his vision was materially obstructed. According to the plaintiff's own testimony, the accident was caused by the sudden lowering of the elevator while he was in the act of placing the empty barrow thereon, and that he had the same halfway on such elevator at that instant. He must therefore have been in close proximity to the outer portion of the runway, and in plain view of the engineer. Again, without a clear view of the landing, how could the engineer stop the elevator on a level with the projecting end of such landing? This had to be done, for otherwise wheelbarrows filled with mortar could not be transferred from the elevator to the landing. When the evidence

is all considered in its most favorable light for the plaintiff, it fails to sustain any of the charges of negligence alleged in the complaint.

In my opinion the above views are unanswerable, and should require a reversal of the judgment and a dismissal of the action.

In my judgment, the plaintiff should also be held to have assumed the risk. The undisputed testimony shows that he was about 19 years of age at the time of the accident, and of at least average intelligence. According to his own testimony, he voluntarily continued in the service of the defendant for a considerable time after the cornice was placed upon the building, and when, as he says, he could not see the engine house. He was therefore bound to know and did know, if his testimony is true, that the engineer could not see him. He therefore should be held to have known and fully appreciated the risk, if any, attendant upon this method of work. He swears positively that there was no such thing as signals and that the engineer operated the elevator mostly by guesswork, yet he continued in the service, making no complaint to the master. It is entirely clear, therefore, that he had the same opportunity of knowing the dangerous character of the work as the defendant had and must have appreciated the risk, for he had the same opportunity as others could possibly have had of knowing and appreciating the same. Assuming the truth of his testimony, he was therefore guilty of negligence as a matter of law, in continuing to work under such conditions.

I am also unable to concur in the holding that the rulings of the trial court were correct, in rejecting the testimony offered by defendant as to photographs taken during the last trial by the witness Holmboe. Questions tending to lay a foundation for the introduction of such photographs were objected to by plaintiff's counsel and the objections sustained, upon the ground that the surrounding conditions were not the same as when the accident occurred. Whereupon defendant's counsel made the following offer of proof: "The defendant offers to prove by a competent photographer, who took photographic views on yesterday at about 11 o'clock in the forenoon, and referred to in the testimony of the witnesses who were present, that at a distance of precisely 20 feet from the building line, and on a line directly east and west from where the engineer was standing when operating the engine, the lens was pointed in a northwesterly direction towards the roof of the building,

at a height of 63 inches from the ground, and that a view at that point was then taken and subsequently developed by the photographer, and that the photograph so taken is a correct and accurate view of what was then within the range of the lens so pointed.

"That on the same north and south line the camera was moved easterly, and then placed at a distance of 25 feet from the building line; that a view was taken from that point, with the lens placed at the same angle and at the same height from the street; that the view was developed by the photographer, and is a true and correct picture and photograph of what was within the range of the lens at that point.

"That the camera was then moved to a point 31 feet from the building line, and to the northeasterly corner of the outline of the engine house marked on the street, to which reference has been made in the testimony of the witness; that a view was taken from that standpoint, with the lens pointed in the same direction and angle, and at the same height from the street; that the view was developed by the photographer, and that a true, correct, and accurate picture of all that came within the range of the lens at that time is shown on the developed picture. And the photograph so developed and taken is marked 'defendant's exhibit 4,' and offered in evidence.

"That the photograph taken and developed at a distance of 25 feet from the building line, referred to in the testimony, is marked 'defendant's exhibit 5,' and is offered in evidence.

"That a photograph taken at the same time and under identically the same circumstances and conditions, with the lens at the same height and angle, taken by the same photographer at a distance of 31 feet from the building line, with the tripod located in the northeast corner of the outline of the building on the street, at the place where the engineer stood when operating the engine, as disclosed by the evidence in the case, is marked 'defendant's exhibit 7,' and is offered in evidence."

To these offers counsel for plaintiff objected, for the reason, as stated, "that they are incompetent, irrelevant, and immaterial in this, that the conditions under which the exhibits were taken, as appears in the offer, and the admission made, shows that they were taken under conditions that were not essentially the same as the conditions existing at the time of the accident."

I think it was palpable error to sustain such objection, and that such

ruling was clearly prejudicial. It should be borne in mind that the only obstruction claimed by plaintiff to the engineer's view was that caused by the cornice, and it is nowhere contended that a signal system was necessary, except on account of such cornice. The fact, therefore, that at the time such photographs were taken the surrounding conditions were not precisely the same as when the accident happened was not decisive, for they were in all essential respects substantially so. And when we consider the sharp conflict upon the crucial question at issue, and the further fact that the testimony on such issue largely preponderated in defendant's favor, no one can say that a different result might not have happened, had the jury been allowed the benefit of such excluded testimony. As to the weight that should be given to photographs as evidence, see Higgs v. Minneapolis, St. P. & S. Ste. M. R. Co. 16 N. D. 446, 15 L.R.A.(N.S.) 1162, 114 N. W. 722, and note to this case in 15 Ann. Cas. 98. See also Mitton v. Cargill Elevator Co. 124 Minn. 65, 144 N. W. 434, from which we quote:

"The trial court excluded photographs of the interior of the engine room. We are asked to determine the correctness of this ruling with reference to another trial. About all the photographs show is the stairway, the stove, and one of the fly wheels, which appeared greatly exaggerated in size. The trial court characterized the photograph that showed the fly wheel thus exaggerated in size as a monstrosity, and excluded both photographs. It is probable that the reason for the court's ruling was that it considered the photographs misleading, though the objection covered also the ground that a diagram of the engine room and steps was already in evidence, thus making the photographs unnecessary, or merely cumulative evidence. It is within the discretion of the court to restrict the undue introduction of evidence that is merely cumulative, whether it be the testimony of witnesses, or demonstrative evidence. But the photographs offered, leaving aside for the moment the question of their being misleading, showed the stairway in a way that no diagram could, and tended to explain and illustrate the testimony of the witnesses much more clearly than did the diagram. We are unable to say that their exclusion was justified on the ground that there was no necessity for their being before the jury.

"Was it for the court to say that the photographs were not true representations, or that they were misleading? The photographer was
31 N. D.—22.

called as a witness, and testified that the photographs were correct
representations, after making due allowance for the enlargement of
objects close to the lens. We think that it was for the jury, and not
for the court, to say whether the photographs lied, just as it was for
the jury, and not for the court, to decide upon the credibility of any
witness. We concur in the statement made by Professor Wigmore on
the subject. 1 Wigmore, Ev. § 792."

To my mind, the reasoning of the majority opinion, to the effect
that the application of the law of mathematics and optics precludes
any other proof, is unsound. It seems to me to be predicated upon the
unwarranted assumption that plaintiff, while in the act of placing the
wheelbarrow upon the elevator, could do so without any portion of his
body or limbs extending out over the edge of the cornice. Just how
plaintiff could perform this feat is not easy for me to comprehend,
when I consider the established and conceded fact that the elevator
platform was a distance of from 6 to 8 inches from the outer edge of
such cornice, and the wheelbarrow had to be placed at such distance
into the elevator as to permit its clearing the various landings as such
elevator was raised and lowered. I submit that these physical facts
alone outweigh the theory advanced with apparently so much con-
fidence in the majority opinion. It is unbelievable that the engineer
could see the wheelbarrow as it was being moved over the runway and
into the elevator, and not be able to see any portion of the man behind
it.

In the majority opinion it is erroneously assumed that plaintiff, at
the time of the accident, must have been from 2 to 3 feet back from
the edge of the cornice, and from this premise the majority apply the
rule of mathematics and optics to show that the engineer could not
have seen plaintiff, and hence a code of signals was necessary. Having
started with an erroneous premise, it is, of course, easy to reach a false
conclusion.

But even if I am in error in the foregoing views, I am firmly of
the opinion that a new trial should be granted for manifest errors in
the instructions, which I now will briefly notice.

At the beginning of the charge the court enumerated, in the language
of the complaint, all the grounds of negligence alleged therein. In
view of the fact that the sole ground of recovery relied on, and the only

act of negligence alleged which has any support whatever in the evidence, is the defendant's failure to install a system of signals, which it is contended was necessary because of the fact that the engineer was located in a place where he could not see the elevator landing or the roof sufficiently plain to enable him to operate such elevator with safety to the plaintiff, I think it was prejudicial error not to restrict the instructions to the one ground or act of negligence aforesaid. But later in the charge, the jury was told, in effect, that the plaintiff might recover if the injury "was caused by and through the negligence of the defendant *in some of the manners charged in the complaint.*" This had a tendency, at least, to mislead and confuse the jury, and, I think, constituted prejudicial error. Again, the jury was instructed "that the plaintiff herein by his contract of employment with the defendant did not assume the risks arising from the want of *sufficient and skilled labor, or from defective machinery or other instruments with which he had to work.*" Conceding that this is abstractly correct, it had no proper application to the evidence, and only tended to mislead the jury.

The same may be said of the following portion of the charge as given: "I further charge you that it was the duty of the defendant in this case to furnish the plaintiff with safe and suitable appliances with which to perform the work required of him, and also to see that the same were kept in proper repair, and if this duty was negligently performed and the plaintiff sustained any injury thereby, the defendant is responsible in damages; provided, that such negligence of the defendant was the direct and proximate cause of the injury, and that the plaintiff did not contribute to the direct and proximate cause of the injury by his own negligence." There was no basis in the evidence for such a charge. My criticism of these instructions is aptly expressed by Judge Jenkins of the circuit court of appeals in Hunt v. Kile, 38 C. C. A. 641, 98 Fed. 49, in the following words: "The charge to the jury contained an excellent exposition in general of the duty of the master to the servant with respect to furnishing fit and suitable appliances. It is subject, however, to just criticism in this, that it is general and not specific with reference to the facts upon which alone liability could properly be predicated. As before observed, the death was caused by the breaking of the anchor rope, all other appliances fitly and safely performing their respective functions. It was not

proper to submit to the jury the question of the sufficiency of those appliances that proved sufficient. The consideration of the jury should have been directed solely to the question of the sufficiency of that rope, its character and condition."

In Brickwood's Sackett on Instructions to Juries, 3d ed. vol. 1, § 179, it is stated:

"Instructions containing mere abstract legal propositions, without any evidence to support them, are calculated to mislead the jury, and should not be given," citing cases, amongst others, Chicago, M. & St. P. R. Co. v. O'Sullivan, 143 Ill. 48, 32 N. E. 398; and the court in such case said: "There should be evidence upon which an instruction given can be based, or the instruction should not be given."

In § 191, the same author says: "When a case is close in its facts, or when there is a conflict in the evidence on a vital point in the case, the rights of parties cannot be preserved unless the jury are accurately instructed." Citing Toledo, W. & W. R. Co. v. Shuckman, 50 Ind. 42.

And again: "An instruction which has a tendency to, and probably did, mislead the jury, when taken singly, is erroneous, even though the instructions when taken together embrace the law of the case." Citing Price v. Mahoney, 24 Iowa, 582; Pittsburgh, C. & St. L. R. Co. v. Krouse, 30 Ohio St. 223, 6 Am. Neg. Cas. 140; Murray v. Com. 79 Pa. 311. For an authority directly in point, see Remmler v. Shenuit, 15 Mo. App. 192.

I fully agree with the statement of respondent's counsel that prejudicial error cannot be predicated upon isolated portions of the charge, if the instructions when read as a whole contain a fair and accurate statement of the law. But I have carefully examined such instructions as a whole, and fail to discover anything therein which tends in the least to correct or render harmless the foregoing excerpts therefrom. Nor can I agree with respondent's contention, that appellant waived any objection to such instructions by failure to request correct instructions or by his failure to request a special verdict. He had a right to a general verdict upon proper instructions. It is not a case of a failure to instruct upon some point or feature of the evidence, but rather a misdirection of the jury, in view of the issues as narrowed by the evidence.

The court refused the following instruction requested by defendant: "Some evidence has been introduced in connection with the cable used in the hoisting and lowering of the elevator here in controversy, and of its breaking and permitting the elevator to descend. I charge you as a matter of law that the breaking of the cable is in no way connected with the accident and resulting injury in this case, and that in determining the question of whether the defendant was negligent you must entirely disregard the strength or weakness of the cable, and no verdict can be based in favor of the plaintiff on the breaking of the cable." I think such refusal was error, especially in view of the fact, as heretofore observed, that the court called the attention of the jury to all of the grounds of negligence alleged in the complaint, and nowhere restricted their consideration to the one ground covered by the evidence. In view of this, it would have been eminently proper to have charged the jury that they had no right to consider any of the grounds of negligence alleged, except that of a failure to install a signal system.

In conclusion, I desire to say that I have no quarrel with the authorities cited and quoted from at length in the very voluminous majority opinion. I merely say that such authorities are in most instances wholly misapplied.

I think the appellant is clearly entitled to a new trial, if not to a dismissal of the action.

I am authorized to say that Justice Goss fully concurs in this dissent.

### On Petition for Rehearing, Filed July 2, 1915.

BRUCE, J. On the petition for rehearing, it is asserted that the claim that any negligence could be attributed to the breaking of the cable was abandoned by counsel for the plaintiff upon the trial, and that therefore the references of the court to the cable in his instructions to the jury constituted reversible error.

While it is true, as stated in the dissenting opinion and in the petition for rehearing, that a statement is made in respondent's brief on this appeal, to the effect that the allegation in the complaint regarding the weakness and defect of the cable was abandoned on the trial and no proof introduced by the plaintiff to substantiate the same, still this court is not bound by assertions in briefs of counsel. The duty of

this court is to review the actions of the trial court, the correctness of which are challenged by the appellant. Appellant has the burden of showing error. The fact that the sufficiency of the cable was deemed an element upon the trial of the action by both parties, as well as by the trial court, is clearly apparent from the record. As stated in the former opinion, plaintiff's counsel demanded a production of the cable; the defendant's counsel offered testimony to show when the cable was purchased, its size, and the price paid therefor. If defendant's counsel believed that the cable was not an element in the case, why did he offer such testimony after the plaintiff's counsel had demanded a production of the cable? Hence, it is clear that defendant's counsel deemed the cable an element to be considered in this case, even after plaintiff had rested without offering any evidence with reference thereto. That the trial court deemed the cable an element in the lawsuit is evident from the fact that it gave the instruction complained of, and also refused to give the instruction, requested by the defendant, eliminating the cable from the jury's consideration. The question of whether the trial court erred, in giving or refusing instructions with reference to the cable, must be determined upon the proceedings had in the court below, the allegations in the pleadings, and the evidence introduced by the parties, and not on statements contained in the briefs of counsel on this appeal. For the reasons given in our former opinion, we are entirely satisfied that the alleged ground of negligence regarding the weakness and defect of the cable had ample support in the evidence to justify the submission thereof to the jury.

Counsel has also pointed out a slight discrepancy or lack of completeness in our reference in the opinion to the testimony of the witness, Fred Swanson. He claims that we should have said that Swanson testified that "when he stood 1 foot back from the edge of the cornice, he saw the place where the engine house stood and the people standing on the street, including the man with the camera. Standing 2 feet back, he had practically the same view as before. When he stood 3 feet from the edge of the cornice, he could barely see the top of the camera." Even if counsel's statement in regard to the testimony is true, it is immaterial. The only purpose that we had in referring to this testimony was to show that the farther one stood from the edge of the roof, the greater would be the obstruction to the line of his vision. The re-

mainder of the petition is devoted to an argument of the propositions argued in the principal briefs, rather than to a citation of overlooked authorities or precedents.

The petition for rehearing is denied.

FISK, Ch. J., and GOSS, J., not participating in the above opinion.